# EXHIBIT A

EXHIBIT A

JANET M. HEROLD
Regional Solicitor
JEREMIAH MILLER
Acting Counsel for Civil Rights
LAURA C. BREMER
Senior Trial Attorney
Office of the Solicitor
UNITED STATES DEPARTMENT OF LABOR
90 7th Street, Suite 3-700
San Francisco, California 94103
Tel: (415) 625-7757
Fax: (415) 625-7772
Email: bremer.laura@dol.gov

RECEIVED

JAN 2 2 2019

Office of Administrative Law Judges
San Francisco, Ca

## UNITED STATES DEPARTMENT OF LABOR
## OFFICE OF ADMINISTRATIVE LAW JUDGES

|  |  |
|---|---|
| **OFFICE OF FEDERAL CONTRACT COMPLIANCE PROGRAMS, UNITED STATES DEPARTMENT OF LABOR,** | : |
| Plaintiff, | : |
| v. | : |
| **ORACLE AMERICA, INC.** | : |
| Defendant. | : |

Case No. 2017-OFC-00006

## <u>OFCCP'S MOTION FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT</u>

# I.    INTRODUCTION

The Office of Federal Contract Compliance ("OFCCP") seeks to amend its complaint to further clarify the scope of Oracle America, Inc.'s ("Oracle's") discrimination against its employees and applicants for employment based on information produced immediately prior to the Court's orders staying the case.[1]

OFCCP's proposed Second Amended Complaint ("SAC") SAC narrows and clarifies the issues in this case, simplifying the matters in dispute and providing a more direct path to the hearing in this matter.  Preliminary analyses of data received by OFCCP in October and November of 2017 strengthen OFCCP's original claims and confirms that stark patterns of discrimination began in at least 2013 and continued well past the review period, as alleged in the original complaint.  The additional refinements in the SAC should sharpen the issues in dispute between the parties and facilitate the resolution of this matter at hearing.

The SAC describes in greater detail how Oracle discriminated against female, Black or African American and Asian employees at its headquarters in Redwood Shores, California ("HQCA") in compensation.  Though OFCCP is not required to plead a method of proof, the SAC describes two potential pathways for this discrimination to occur: (1) Oracle's reliance on prior salary in setting initial pay, and/or (2) the channeling of female, Black and Asian employees into lower-paid careers at Oracle.  *See* Exhibit A (Proposed Second Amended Complaint) at ¶¶ 18-31, Tables 4-6.  OFCCP's preliminary analyses of the limited information produced in discovery so far[2] shows that Oracle suppressed starting salaries for its female and non-White employees, assigned them to lower level positions and depressed their wages over the

---

[1] This case has been stayed since October 2017.  *See* section II.B.  The most recent stay, entered November 13, 2018, granted the request to stay all activity in the case until motions Oracle filed on October 23, 2018 were resolved.  Because the stay has been lifted by the Court, the Secretary now brings this motion.

[2] The parties also engaged in approximately one year of mediation between October of 2017 and October of 2018.  That period of discussion helped the parties more fully understand each other's positions on many topics germane to this litigation.

years they worked at Oracle. *Id.* OFCCP's preliminary analyses show that Oracle's method of compensating employees for their work resulted in losses of more than $400 million for female, Black and Asian employees. *Id.* at ¶¶ 13-17, Tables 1-3.

The SAC also narrows the hiring claims in the Amended Complaint. The SAC explains that Oracle's highly discriminatory *college and university hiring* practices[3] at HQCA strongly preferred Asian recent college and university graduates to all others. This preference is so strong that of the approximately 500 college and university hires made by Oracle from 2013 to 2016, approximately 450, or 90%, were Asian. *Id.* at ¶¶ 32-39, Table 7. OFCCP's preliminary analysis shows that this discriminatory hiring pattern is wholly belied by the labor pool from which Oracle draws: Oracle's targeted college and university population is approximately 65% Asian, well below the ratio recruited and employed by Oracle. *Id.* A more granular review of the data produced by Oracle highlights the overall extreme preference for hiring Asian students. In several years, Oracle hired *zero* Black or Hispanic recent college and university graduates. *Id.* Not only does Oracle prefer to hire Asian recent college and university graduates, but it prefers to hire visa-holding Asian recent college and university graduates. *Id.* It even has a program to hire a set number of recent graduates from Indian schools each year. *Id.* at ¶ 39. This preference for a workforce that is dependent on Oracle for authorization to work in the United States lends itself to suppression of that workforce's wages. *Id.* at ¶ 38. Oracle's focus on hiring Asian recent college and university graduates resulted in the refusal to hire more than 100 qualified, non-Asian, applicants for employment. *Id.* at ¶ 37.

The SAC also provides a more precise statement of the information that Oracle refused to provide as required by law during the compliance review. *Id.* at ¶¶ 43-46. It also clarifies what data is missing due to Oracle's refusal to keep, maintain and produce critical required information. *Id.* Tellingly, discovery revealed that not only did Oracle refuse to produce key

---

[3] OFCCP's SAC does not allege hiring discrimination with respect to experienced hires. However, if further discovery or analysis of existing data demonstrates further discrimination with respect to experienced hires for Oracle's Professional Technical 1 ("PT1") group, OFCCP will seek to amend its Complaint again to allege such violations.

documents and data it was required to keep during the compliance review and in discovery – it destroyed records relating to its hiring process *as the case was ongoing. Id.* at ¶ 45.

Under the liberal rules for amending the pleadings, leave to amend should be granted. Such amendments will not prejudice Oracle. This case reverts to litigation with discovery still open; the SAC narrows some issues, and provides more detail as to others, making remaining discovery more efficient. OFCCP has sought leave in good faith, and there has been no undue delay in bringing the SAC, given that the case has been stayed since October 2017, when Oracle finally began producing the data that OFCCP relies upon in revising its claims. Therefore, the Court should grant OFCCP leave to file the SAC.

## II. BACKGROUND

### A. The Amended Complaint Alleged Claims Based on the Limited Data and Information Oracle Provided to OFCCP during the Compliance Review.

Oracle, one of the world's largest technology companies, receives over $100 million in public money per year from federal contracts. *See* Bremer Decl. ¶ 2, Ex. 1 (Oracle Fact Sheet (Oracle provides technology to the top companies and governments worldwide)); Bremer Decl. ¶ 2, Ex. 2 (Letter from E. Connell to M. Pilotin (Aug. 7, 2017), p. 2 (Oracle stipulated "it has been a covered federal contractor for over 20 years and the total amount of its government contracts has exceeded $100 million each year since 2013")).

It is axiomatic that the government may set the terms upon which those wishing to do business with it must operate. *See Perkins v. Lukens Steel Co.*, 310 U.S. 113, 127 (1940) ("[l]ike private individuals and businesses, the Government enjoys the unrestricted power to produce its own supplies, to determine those with whom it will deal, and to fix the terms and conditions upon which it will make needed purchases"); *see also U. S. Brewers Ass'n, Inc. v. Envtl. Prot. Agency*, 600 F.2d 974, 984 (D.C. Cir. 1979) ("[i]t is settled that the federal government may exact, from those with whom it does business, compliance with standards or requirements different from those found in the marketplace generally"). In exchange for obtaining public

3

money, federal contractors must agree not to discriminate against their employees or applicants for employment on the basis of race, color, sex, or national origin; they must also agree to federal government audits of their compliance with nondiscrimination requirements. *See* Executive Order 11246 § 202, 30 Fed. Reg. at 12319 (Sept. 24, 1965), as amended by Executive Orders 11375, 12086 and 13279 and its implementing rules and regulations (the "Executive Order"); *see also* 41 C.F.R. §§ 60-1.12, 60-1.20, 60-1.43; *Uniroyal, Inc. v. Marshall*, 482 F. Supp. 364, 370 (D.D.C. 1979) (approving the non-discrimination obligations under the Executive Order as a feature of the government's power to set the terms of contracts with private parties).

In September 2014, OFCCP initiated a compliance review at Oracle's HQCA facility. Answer to Amended Complaint, ¶ 6, p. 12. Oracle only produced some of the information properly sought by OFCCP. Bremer Decl. ¶ 4. An analysis of the data that Oracle *did* provide during the compliance review revealed: (1) disparities in the compensation of women relative to men employed in the Product Development, Information Technology, and Support job functions at Oracle's HQCA; (2) disparities in the pay of Asians, and Blacks or African Americans relative to Whites employed in Oracle's Product Development job function at Oracle's HQCA; and (3) disparities in the hiring non-Asian applicants relative to Asian applicants. *See* Notice of Violation (March 11, 2016), Bremer Decl. ¶ 5, Ex. 3.

Based in part on these analyses, OFCCP filed suit on January 17, 2017 alleging compensation and recruiting and hiring discrimination. *See* Complaint (filed Jan. 17, 2017); *see also* Amended Complaint (filed Jan. 25, 2017) (correcting a typo). Specifically, the Amended Complaint alleges that Oracle violated the Executive Order from at least 2013 continuing to the present in the following ways:

- "Oracle discriminated against qualified female employees in its Information Technology, Product Development, and Support lines of business or job functions at Oracle Redwood Shores based upon sex by paying them less than comparable males employed in similar roles" (Amended Complaint pp. 1, 3, 6 ¶¶ 7, 16);

- "Oracle discriminated against qualified African Americans [and Asians] in Product Development roles at Oracle Redwood Shores based upon race by paying them less than comparable Whites employed in similar roles" (Amended Complaint pp. 1, 3-4, 6 ¶¶ 8-9, 16);

- "Oracle . . . continues to utilize a recruiting and hiring process that discriminates against qualified African American, Hispanic and White (hereinafter 'non-Asians') applicants in favor of Asian applicants, particularly Asian Indians, based upon race for positions in the Professional Technical 1, Individual Contributor ('PT1') job group and Product Development line of business (or job function) at Oracle Redwood Shores" (Amended Complaint pp. 1, 4, 6 ¶¶ 10, 16); and

- Oracle refused to produce "various records," and refused to produce analyses of its compensation and employment practices it was required to conduct pursuant to 41 C.F.R. §§ 60-2.17(b)-(d), 60-3.15A, 60-3.4. (Amended Complaint pp. 1, 5-6 ¶¶ 11-16). Insofar as Oracle did not conduct the reviews and analyses, required by these regulations, it defaulted on its obligations under the regulations. (Amended Complaint p. 5-6 ¶¶ 13-14).

The Amended Complaint further describes analyses supporting these allegations based on the limited data provided by Oracle during the compliance review showing a compensation snapshot on January 1, 2014, and hiring data from January 1, 2013 through June 30, 2014. Amended Complaint pp. 1, 4-5, ¶¶ 7-10.

### B. Oracle Produced, For the First Time, Significant Data for Employees Covering 2013 through 2016 in October 2017.

As with most employment actions, the vast majority of relevant information—including data about its applicants and employees and its hiring and compensation practices and policies—resided in Oracle's control. Although OFCCP served requests seeking these critical documents from Oracle on February 10 (two days after Oracle filed its answer) and 21, 2017, Oracle did not produce the bulk of the responsive documents or data until October 2017 (eight months after

5

OFCCP requested it). Bremer Decl. ¶¶ 6-13. Prior to that data production, Oracle's litigation positions prevented OFCCP from taking depositions or obtaining significant discovery. After the October 2017 production, the matter was stayed, halting the discovery process for a year while the parties attempted to resolve their dispute through mediation.

On October 12, 2018, after the parties reached an impasse in mediation, the OALJ granted OFCCP's motion to reassign this case to a new ALJ. Oracle then filed a motion challenging this Court's authority to preside over this case, and the Court stayed the proceedings again pending the resolution of those motions. *See* November 13, 2018 Order. The stay was lifted on January 22, 2019. Thus, this case has been stayed almost the entire time since Oracle made its initial data productions in October and November 2017.

Although additional discovery remains to be conducted,[4] after receiving Oracle's production of documents and data in October and November 2017, OFCCP conducted preliminary analyses of the data, which provide the basis for the SAC.

### C. OFCCP Seeks to Revise Its Claims Based on Evidence OFCCP Obtained through Discovery.

The proposed SAC revises OFCCP's claims and alleges new facts related to Oracle's discrimination in recent years, based on the additional data and information Oracle provided in discovery.

The compensation discrimination claims remain essentially unchanged. The SAC continues to allege:

- Since at least January 1, 2013, Oracle discriminated against qualified female employees in its Product Development, Information Technology, and Support job functions at Oracle's

---

[4] Although Oracle produced documents and data before the parties began mediating, more information is required, including internal pay equity analyses and a supplementation of the hiring and compensation data covering January 1, 2017 through the present. Bremer Decl. ¶ 15. OFCCP anticipates requesting additional documents and data from Oracle, as well as taking depositions, which have not yet begun. The refinements to OFCCP's allegations in the SAC will not disrupt the course of this litigation; in fact they will help move the matter to hearing as they narrow and clarify OFCCP's allegations.

headquarters based upon sex by paying them less than comparable males employed in similar roles.

- Since at least January 1, 2013, Oracle discriminated against qualified Asian and Black or African American employees in its Product Development job function at Oracle's headquarters based on race or ethnicity by paying them less than comparable White employees employed in similar roles.

Exhibit A, ¶¶ 12-31. While the original Amended Complaint included a statistical analysis based on compensation data from 2014, the proposed SAC includes a preliminary analysis of the data Oracle produced in October and November 2017, spanning four years, from January 1, 2013 through December 31, 2016. *Id.* The data over this four-year period reveal that the pay gap for these groups has persisted throughout their employment by Oracle. *Id.* at ¶¶ 14-16. Moreover, the data Oracle produced reveals that the longer that female and Asian employees stay with Oracle, the less they are paid in relation to other employees. *Id.* at ¶¶ 25-31. This discrimination has cost employees more than $400 million in lost wages. *Id.* at ¶ 17.

Additionally, though OFCCP is not required to plead a method of proof, the SAC alleges that Oracle's systemic underpayment of female and Asian employees may be due, in part, to Oracle's suppression of employees' starting pay, placement of female, Black or African American and Asian employees in lower global career levels, and continued suppression of their pay throughout their careers. *Id.* ¶¶ 18-31.

The SAC also makes the same hiring discrimination claim as made in the Amended Complaint. However, the SAC includes supplemental details about the hiring claim, based on discovery conducted and data produced spanning the years 2013 through 2016. *Id.* at ¶¶ 32-39. Additionally, the SAC narrows OFCCP's hiring claim to focus on Oracle's discriminatory practices in college and university recruitment for low-level professional technical positions. *Id.*[5]

---

[5] Thus, OFCCP does not allege that Oracle discriminated against experienced applicants for positions in the PT1 job group at this time. *See* Amended Compl. ¶ 10. If further discovery or analysis reveals discrimination against experienced applicants for PT1 positions, OFCCP will amend its Complaint as necessary.

Oracle's college and university hiring policies resulted in more than 100 qualified, non-Asian applicants for employment being denied employment.

Finally, the SAC makes similar allegations to those in the Amended Complaint that Oracle failed to supply records requested by OFCCP during the compliance review, in violation of the regulations, and failed to produce materials demonstrating whether it conducted analyses required by the regulations. *Id.* ¶¶ 43-46. The SAC provides more specificity about the records Oracle failed to supply to OFCCP during the compliance review, and the analyses it failed to conduct. *Id.* Since discovery revealed that Oracle not only failed to supply information requested by OFCCP, but failed to even collect or maintain some of this information, the SAC specifically alleges violations for the failure to collect and maintain information required by the regulations. *Id.* Moreover, the SAC alleges that Oracle's failure to even obtain information (including the identity of all applicants to Oracle's college and university recruiting program) necessary to conduct required analyses and comply with its affirmative action obligations, violated 41 C.F.R. §§ 60-1.12, and 41 C.F.R. Parts 2, 3. SAC ¶ 45.

## III.    ARGUMENT

After an answer has been filed, the complaint may be amended either by consent or "by leave of the Administrative Law Judge." 41 C.F.R. § 60-30.5; *see also* Fed. R. Civ. P. 15(a)(2). Like the Federal Rules, the regulations instruct that "leave shall be freely given where justice so requires." 41 C.F.R. § 60-30.5; *see also* Fed. R. Civ. P. 15(a)(2). Thus, the Department's Administrative Law Judges, like federal district courts, grant leave to amend liberally, unless the amendment (1) would cause the opposing party undue prejudice, (2) is sought in bad faith, (3) would be futile, or (4) has been unduly delayed. *See JBS USA*, Case No. 2017-0FC-00002 (April 23, 2018), at 2 (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)); *see also Eminence Capitol, LLC v. Aspeon*, 316 F.3d 1048, 1052 (9th Cir. 2003). Applying this standard, leave to amend should easily be granted.

Oracle will not be prejudiced by the proposed amendments, which is the "touchstone of the inquiry" on a motion for leave. *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003). Prejudice may occur when an amendment "greatly alter[s]" the nature of the litigation, requires preparation of entirely new defenses, or discovery has already closed. *See, e.g.*, *Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990). Importantly, OFCCP is not alleging any new types of discrimination. OFCCP continues to claim compensation discrimination and recruiting and hiring discrimination against the same protected categories. The SAC includes allegations that provide additional support for the broad discrimination allegations, based on OFCCP's preliminary analysis of Oracle's discovery production to date. These types of amendments that clarify existing claims are routinely allowed courts. *See, e.g.*, *Bank of America*, Case No. 1997-OFC-016 (Jan. 21, 2010), at 3 (noting court had granted OFCCP leave to amend the complaint to clarify the groups affected by the discrimination alleged in the original complaint). Indeed, courts often allow amendments involving far more substantial changes based on evidence produced in discovery. *See, e.g. JBS USA*, Case No. 2017-0FC-00002 (April 23, 2018) (allowing OFCCP to allege new types of discrimination based on information provided in discovery).

This complex case remains in its initial stages, so Oracle will not be prejudiced by an amendment at this stage of the litigation. *See Dunbar v. Google, Inc.*, 2012 WL 6202797, at *17 (N.D. Cal. Dec. 12, 2012) (finding no prejudice because merits discovery was still open). To the contrary, the proposed SAC will narrow the issues in the parties' remaining discovery, focus any motions, and make this litigation more efficient. Furthermore, this case has only recently been assigned to this Court, and no schedule has been set. *See Mendia v. Garcia*, 165 F. Supp. 3d 861, 874 (N.D. Cal. 2016) (finding no prejudice because no case management deadlines had been established and discovery had not yet commenced).

Nor are the proposed amendments due to undue delay, bad faith or dilatory motive. OFCCP diligently sought the information it needed for its allegations in this case – information that is solely within Oracle's control. OFCCP seeks to amend the complaint at its first

opportunity since Oracle produced the critical data it relies upon in making its amendments. Oracle finally produced data covering the period 2013 through 2016 on October 11 and 31, 2017. Since the case has been stayed since October 2017, this is OFCCP's first opportunity to amend the complaint after receiving this critical information.

Finally, there is no basis for Oracle to claim futility. Indeed, the SAC strengthens OFCCP's claims and shows that Oracle has continued to systematically discriminate against employees and applicants based on gender and race after the time frame covered by the compliance evaluation. *See supra* Part II.C.

### IV.    CONCLUSION

Based on the above, OFCCP respectfully requests that it be granted leave to file the SAC.

Dated:  January 22, 2019                    Respectfully submitted,

                                            KATE S. O'SCANNLAIN
                                            Solicitor of Labor

                                            JANET M. HEROLD
                                            Regional Solicitor

                                            JEREMIAH MILLER
                                            Acting Counsel for Civil Rights

                                            LAURA C. BREMER
                                            Senior Trial Attorney

EXHIBIT A

UNITED STATES DEPARTMENT OF LABOR

OFFICE OF ADMINISTRATIVE LAW JUDGES

| | |
|---|---|
| OFFICE OF FEDERAL CONTRACT COMPLIANCE PROGRAMS, UNITED STATES DEPARTMENT OF LABOR, | OALJ Case No. 2017-OFC-00006 OFCCP No. R00192699 |
| Plaintiff, | |
| v. | |
| ORACLE AMERICA, INC., | |
| Defendant. | |

## SECOND AMENDED COMPLAINT

Oracle America, Inc. ("Oracle") discriminates against female, Black or African American, Hispanic, White and Asian employees at its headquarters in Redwood Shores, California ("HQCA"). It impermissibly denies equal employment opportunity to non-Asian applicants for employment, strongly preferring a workforce that it can later underpay. Once employed, women, Blacks and Asians are systematically underpaid relative to their peers. This underpayment is driven by many factors, including Oracle's reliance on prior salaries in setting starting salaries and its steering of those employees into lower paid jobs. Oracle's suppression of pay for its non-White, non-male employees is so extreme that it persists *and gets worse* over long careers; female, Black and Asian employees with years of experience are paid as much as *25%* less than their peers.

Oracle's discriminatory compensation practices affect thousands of employees at its

headquarters. Oracle underpaid women in jobs in its Product Development, Information Technology and Support Job Functions, resulting in pay disparities as high as 20%. This disparity affected more than 5,000 women over the period of this lawsuit.

For Asian employees, the story is very similar; Asians were underpaid (relative to White employees) in jobs in Oracle's Product Development Job Function, resulting in pay disparities as high as 8%. This disparity affected more than 11,000 Asians over the period of this lawsuit.

The few (less than 30) Black or African American employees at Oracle also suffered significant pay discrimination. Those employees were underpaid (relative to White employees) in jobs in Oracle's Product Development job function, resulting in pay disparities as high as 7.5%.

At this stage, these illegal underpayments appear to be driven, in part, by Oracle's assignment of female and non-White employees to low-level positions and low starting pay, and the subsequent depressive effect on their compensation throughout their careers. Oracle's compensation practices cause an increasing pay gap as those employees devote more of their lives to Oracle.

Oracle's discrimination against its own employees has cost these employees at least $401,000,000 in lost wages for the period from 2013-2016.

Oracle also discriminated on the basis of race or ethnicity in recruiting and hiring recent graduates from colleges and universities for low level professional technical positions. Oracle strongly preferred hiring Asian recent college graduates for Product Development jobs, almost to the exclusion of qualified available graduates of any other race or ethnicity. Over a four-year period, between 2013 and 2016, over 90% of Oracle's approximately 500 hires into the Professional Technical 1, Individual Contributor ("PT1") job group through its college recruiting program were Asian, even though less than 65% of the graduates recruited

by Oracle were Asian.[1]  The vast majority of Oracle's hires through its college recruiting

program were international students with student visas, almost all of whom were Asian.

These students required work authorization to remain in the United States after graduation.

In other words, Oracle overwhelmingly hires workers dependent upon Oracle for

sponsorship to remain in the United States.

Moreover, only five of the approximately 500 graduates Oracle hired into the PT1

job group through its college recruiting program identified as Hispanic, and Oracle hired

*zero* Hispanic graduates in 2015.  Similarly, in the four years between 2013 and 2016,

Oracle hired only six African American or Black recent college graduates into positions in

the PT1 job group, and Oracle hired *zero* Black or African American recent college

graduates in 2016.

OFCCP brings this action to end that discrimination.  OFCCP seeks to compel Oracle

to honor the agreement it made to provide equal employment opportunity when it accepted

over one hundred million dollars annually from taxpayers.[2]  This Court should require

Oracle to pay its injured employees and applicants for employment for their lost wages and

to correct its discriminatory compensation and hiring practices.

Oracle's conduct, as further described below, violates Executive Order 11246, and

Oracle's contractual obligations to the federal government.

---

[1] Oracle further increased its hires of Asian recent college graduates by hiring approximately 15 additional Asians each year directly from India through a campus hiring program solely for graduates of colleges in India.

[2] The federal government prohibits using taxpayer money to fund employers that discriminate. *See* Executive Order 11246 § 202, 30 Fed. Reg. 12319 (Sept. 24, 1965), as amended by Executive Orders 11375, 12086 and 13279 and its implementing rules and regulations ("Executive Order 11246" or the "Executive Order").  To promote this important policy, in exchange for the privilege of obtaining federal business, federal contractors must agree that they will not discriminate (obligations similar to Title VII, which applies to most private employers), and to additional requirements that apply only to federal contractors. *See* 41 C.F.R. § 60-1.4. Oracle, one of the world's largest technology companies, receives over 100 million dollars each year from its contracts with the federal government.

## JURISDICTION

1.     The Court has jurisdiction of this action under sections 208 and 209 of Executive Order 11246, and 41 C.F.R. § 60-1.26 and part 60-30.

## ORACLE AND ITS STATUS AS A GOVERNMENT CONTRACTOR

2.     Defendant Oracle America, Inc., designs, manufactures, and sells software and hardware products, as well as offers services related to its products. It is headquartered at Redwood Shores, California, and has 74 locations throughout the United States.

3.     At all times relevant hereto, Oracle has had 50 or more employees. In 2014, Oracle employed approximately 45,000 full-time employees in the United States, and approximately 7,500 employees at its United States headquarters at Redwood Shores.

4.     At all times relevant hereto, Oracle has had at least one contract with the federal government of $50,000 or more. Indeed, during the relevant time frame, Oracle had multiple contracts with the federal government totaling over one hundred million dollars per year.

5.     Based on the foregoing, Oracle has been a contractor within the meaning of the Executive Order, and has been subject to the obligations imposed on contractors by the Executive Order and its implementing regulations. These laws require, among other things, that Oracle not discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin and to take affirmative action to ensure that applicants and employees are afforded employment opportunities without regard to their race, color, religion, sex, or national origin.

## COMPLIANCE EVALUATION OF ORACLE AND FINDINGS OF DISCRIMINATION

6.      On or about September 24, 2014, pursuant to its neutral selection process, OFCCP initiated a compliance review under the Executive Order of Oracle's headquarters in Redwood Shores, California.

7.      As a result of the compliance review, on March 11, 2016, OFCCP issued a Notice of Violation, which is attached hereto as Exhibit A, and incorporated herein.  The Notice of Violation informed Oracle of OFCCP's allegations of discrimination, and which employees were affected by that discrimination.

8.      On June 8, 2016, OFCCP issued a Notice to Show Cause why enforcement proceedings should not be initiated.

9.      From March 11, 2016 through June 8, 2016, OFCCP attempted to conciliate the alleged violations with Oracle, meeting in person and corresponding about the substance of all allegations and providing Oracle with an ample opportunity to correct its discriminatory practices.  After issuing the Notice to Show Cause, OFCCP continued to attempt to resolve the alleged violations through conciliation for another six months.  During that time, OFCCP communicated extensively with Oracle, both in writing and in person, giving Oracle additional opportunities to explain its behavior and correct the violations.  In January of 2017, OFCCP concluded that its nine-month effort to resolve the violations by conciliation had failed.

10.     After efforts to conciliate with Oracle failed, and Oracle refused to remedy the violations OFCCP found, OFCCP initiated this litigation in January 2017.

## SPECIFIC ALLEGATIONS OF DISCRIMINATION

11.     OFCCP's continued evaluation of Oracle's employment practices reveals widespread discrimination at HQCA.  Since initiating this litigation, Oracle produced

additional information to OFCCP, including data for the period 2013 through 2016. In light of that additional information, OFCCP conducted additional analyses. As described in detail below, the results of the continued analysis provide additional support for OFCCP's allegations that Oracle discriminated against women, Asians, and African Americans or Blacks in compensation, and discriminated in favor of Asians against non-Asians in hiring. OFCCP's models, results, and theories of causation will continue to be refined as additional discovery is obtained, and expert(s) evaluate the data and evidence.

12.     Since at least January 1, 2013, Oracle discriminated against qualified female employees in its Product Development, Information Technology, and Support Job Functions at HQCA based upon sex by paying them less than comparable males employed in similar roles. Since at least January 1, 2013, Oracle discriminated against qualified Asian and Black or African American employees in its Product Development job function at Oracle's headquarters based on race or ethnicity by paying them less than comparable White employees employed in similar roles.

13.     OFCCP's analysis of Oracle's compensation policies and data recording its compensation of employees from 2013 through 2016, shows that Oracle systematically undercompensated female and Asian employees with respect to their total compensation from at least 2013 to 2016. OFCCP analyzed total compensation for Oracle's employees by year and by Job Function (Product Development, Information Technology and Support services) and controlled for time-in-company, previous experience, FLSA exempt status, part time or full time status, global career level, job specialty and standard job title.

14.     Using the methodology described in paragraph 13, OFCCP's regression analysis for female employees, based on the data and information obtained thus far, reveals the following disparities between the total compensation for females and males at Oracle's headquarters, corresponding to a loss of at least $165,000,000 in total compensation for women at Oracle. These results are statistically significant.

| Job Function-Year | # Female EEs | # EEs | Pay gap (%) | Example Annual Wages Lost |
|---|---|---|---|---|
| IT-2013 | 124 | 440 | -7.26 | -$13,366.31 |
| IT-2014 | 124 | 447 | -10.37 | -$19,092.10 |
| IT-2015 | 136 | 556 | -10.23 | -$18,834.34 |
| IT-2016 | 143 | 604 | -9.41 | -$17,324.65 |
| PD-2013 | 1118 | 3890 | -6.78 | -$12,482.59 |
| PD-2014 | 1104 | 3855 | -7.77 | -$14,305.26 |
| PD-2015 | 1071 | 3786 | -5.89 | -$10,844.02 |
| PD-2016 | 1045 | 3780 | -6.84 | -$12,593.05 |
| S-2013 | 42 | 232 | -14.62 | -$26,916.73 |
| S-2014 | 42 | 220 | -16.73 | -$30,801.43 |
| S-2015 | 31 | 103 | -12.77 | -$23,510.71 |
| S-2016 | 23 | 95 | -20.05 | -$36,913.84 |

**Table 1: analysis of the effect of gender on total compensation at Oracle (IT= InfoTech, PD=Product Development, S = Support Job Functions) (Example Annual Wages Lost=amount lost relative to average total compensation in 2016, per employee)**

15.    Using the methodology described in paragraph 13, OFCCP's regression analysis, based on the data and information obtained thus far, reveals the following disparities between the total compensation for Asian employees and White employees at Oracle's headquarters, corresponding to a loss of at least $234,000,000 in total compensation for Asian employees at Oracle.  These results are statistically significant.

| Job Function-Year | # Asian EEs | # EEs | Pay gap (%) | Example Annual Wages Lost |
|---|---|---|---|---|
| PD-2013 | 2735 | 3771 | -3.37 | -$6,204.47 |
| PD-2014 | 2747 | 3738 | -7.92 | -$14,581.43 |
| PD-2015 | 2723 | 3657 | -6.99 | -$12,869.21 |
| PD-2016 | 2750 | 3629 | -4.02 | -$7,401.18 |

**Table 2: analysis of the effect of being Asian on total compensation at Oracle (PD=Product Development Job Function) (# EEs=total of Asian and White employees) (Example Annual Wages Lost=amount lost relative to average total compensation in 2016, per employee)**

16.    OFCCP's analysis of base compensation at Oracle (applying the same

methodology described in paragraph 13, substituting base compensation or salary for total compensation) shows that Black or African Americans are significantly under-compensated relative to their White peers for some years in the Product Development, resulting in a loss of more than $1,300,000 to those employees. These results are statistically significant.

| Job Function-Year | # Black EEs | # EEs | Pay gap (%) | Example Annual Wages Lost |
|---|---|---|---|---|
| PD-2015 | 25 | 962 | -7.20 | -$9,521.18 |
| PD-2016 | 29 | 910 | -7.65 | -$10,116.26 |

**Table 3: analysis of the effect of being Black on base compensation at Oracle (PD=Product Development Job Function) (# EEs=total of Black or African American and White employees) (Example Annual Wages Lost=amount lost relative to average base compensation in 2016, per employee)**

17.     OFCCP estimates that this underpayment, described in paragraphs 14-16 cost employees at least $401,000,000 in lost total compensation. Because OFCCP believes that Oracle has not adjusted pay and corrected its compensation practices as of the date of this Amended Complaint, the total cost of Oracle's discrimination is much higher as these practices have continued to the present date, more than two years after the initial filing of the first Complaint in January 2017.

18.     OFCCP's preliminary analyses show that Oracle's discriminatory payment practices may start at hire. Oracle pays women and Asians less on hire, either by suppressing their pay relative to other employees in the same or comparable job, or by hiring them for lower-paid jobs. OFCCP evaluated the likelihood that a given employee would be assigned to a higher level within Oracle's global career level framework (where lower levels correspond to less responsibility and pay), controlling for the year and previous experience.

19.     Using the methodology described in paragraph 18, OFCCP's regression

analysis, based on the data and information obtained thus far, reveals that women were only 70% as likely as men to be assigned into higher global career levels as individual contributors, and only 42% as likely as men to be assigned to higher global career levels as managers. These results were statistically significant.

20.     Using the methodology described in paragraph 18, OFCCP's regression analysis, based on the data and information obtained thus far, reveals that Black or African American employees were only 17% as likely as Whites to be assigned to higher global career levels as individual contributors. There were *zero* Black or African American employees in management career levels at Oracle between 2013 and 2016. The result for individual contributors was statistically significant.

21.     Using the methodology described in paragraph 18, OFCCP's regression analysis, based on the data and information obtained thus far, reveals that Asians were only 49% as likely as Whites to be assigned into higher global career levels as managers. This result was statistically significant.

22.     After evaluating Oracle's compensation practices, OFCCP's preliminary analyses show that the systematic underpayment of female and Asian employees is due, in part, to suppression of those employees' starting pay. That is, Oracle paid women and Asians less on hire, either by suppressing their pay relative to other employees in the same or comparable job, or by hiring them for lower-paid jobs. As demonstrated in paragraphs 19-21, Oracle is, in part, discriminating against female, Asian and Black or African American employees by placing those employees in lower global career levels. However, even when OFCCP considers those tainted global career levels in its modeling, Oracle still discriminates against Asians and women in their base compensation upon hiring them. OFCCP analyzed employees' base compensation in their year of hire, controlling for the year, previous experience, FLSA exempt status, full time or part time status, and Oracle's assigned global career level.

23.    Using the methodology described in paragraph 22, OFCCP's regression analysis, based on the data and information obtained thus far, reveals that female employees are paid less than male employees on hire at Oracle. These results are statistically significant.

24.    Using the methodology described in paragraph 22, OFCCP's regression analysis, based on the data and information obtained thus far, reveals that Asian employees are paid less than White employees on hire at Oracle. This result is statistically significant.

25.    After evaluating Oracle's compensation practices, OFCCP's preliminary analyses show that the systemic underpayment of female, Black or African American, and Asian employees continued and worsened throughout their employment by Oracle. That is, Oracle suppressed the pay of female and Asian employees by ensuring they remained in lower-paid positions relative to other employees, or at the lower end of the pay range relative to other employees in the same positions. OFCCP analyzed the base compensation for female, Black or African American and Asian employees in Product Development (the largest job function at Oracle's facility), grouping them into clades with varying amounts of experience, and controlling for year, previous experience, FLSA exempt status and full time or part time status.

26.    Using the methodology described in paragraph 25, OFCCP's regression analysis, based on the data and information obtained thus far, reveals that the pay gap increases for female employees as they remain at Oracle for longer periods of time. These results are statistically significant.

///

///

///

///

///

| Function-tenure range (years) | # Female EEs | # EEs | Pay gap (%) | Example Per EE |
|---|---|---|---|---|
| PD-1 to <3 | 769 | 3018 | -8.58 | -$11,346.08 |
| PD-3 to <5 | 561 | 2124 | -11.26 | -$14,890.07 |
| PD-5 to <7 | 301 | 1345 | -11.99 | -$15,855.42 |
| PD-7 to <9 | 532 | 1751 | -17.74 | -$23,459.14 |

**Table 4: analysis of the effect of gender on base compensation by tenure group (PD=Product Development Job Function) (Example Per EE=amount lost relative to average base compensation in 2016, per employee)**

27.    Using the methodology described in paragraph 25, OFCCP's regression analysis, based on the data and information obtained thus far, reveals that the pay gap increases for Asian employees as they remain at Oracle for longer periods. These results are statistically significant.

| Function-tenure range (years) | # Asian EEs | # EEs | Pay gap (%) | Example Per EE |
|---|---|---|---|---|
| PD-1 to <3 | 2373 | 2843 | -5.60 | -$7,405.37 |
| PD-3 to <5 | 1559 | 2017 | -4.37 | -$5,778.83 |
| PD-5 to <7 | 961 | 1290 | -6.59 | -$8,714.53 |
| PD-7 to <9 | 1271 | 1710 | -10.09 | -$13,342.88 |

**Table 5: analysis of the effect of being Asian on base pay by tenure group (PD=Product Development Job Function) (# EEs=total of Asian and White employees) (Example Per EE= amount lost relative to average base compensation in 2016, per employee)**

28.    Using the methodology described in paragraph 25, OFCCP's regression analysis, based on the data and information obtained thus far, reveals that the pay gap increases for Black or African American employees as they remain at Oracle for longer periods. These results are statistically significant for 1 to 3 years, 5 to 7 years, and 7 to 9 years.

///

///

///

///

| Function-tenure range (years) | # Black EEs | # EEs | Pay gap (%) | Example Per EE |
|---|---|---|---|---|
| PD-1 to <3 | 15 | 485 | -15.81 | -$20,906.93 |
| PD-3 to <5 | 19 | 477 | -1.46 | -$1,930.68 |
| PD-5 to <7 | 15 | 344 | -12.49 | -$16,516.61 |
| PD-7 to <9 | 11 | 450 | -25.26 | -$33,403.49 |

**Table 6: analysis of the effect of being Black on base pay by tenure group (PD=Product Development Job Function) (# EEs=total of Black or African American and White employees) (Example Per EE=amount lost relative to average base compensation in 2016, per employee)**

29.      After evaluating Oracle's compensation practices, OFCCP's preliminary analyses show that the systemic underpayment of female and Asian employees continued and worsened throughout their employment by Oracle. That is, Oracle suppressed the pay of female and Asian employees by ensuring they remained in lower-paid positions relative to other employees, or at the lower end of the pay range relative to other employees in the same positions. OFCCP analyzed the growth in base compensation for female and Asian employees (excluding those employees whose base compensation dropped by more than $1,000 in a year) in Product Development (the largest job function at Oracle's facility), over the period from 2003 to 2016, controlling for the change in those employees' global career levels, the change in those employees' job title, previous experience, time at Oracle and year.

30.      Using the methodology described in paragraph 29, based on the data and information obtained thus far, reveals that women experienced slower wage growth than their male peers to a statistically significant degree.

31.      Using the methodology described in paragraph 29, based on the data and information obtained thus far, reveals that Asians experienced slower wage growth than their non-Asian peers to a statistically significant degree.

32.      After evaluating Oracle's hiring policies and practices OFCCP's preliminary analyses show that Oracle hired approximately 125 recent college or

university graduates per year at its headquarters for low-level Product Development positions in Oracle's PT1 job group, including software development and applications development positions. Oracle's "college recruiting program" recruited graduates in Computer Science, Engineering, and Math from a list of "top schools" Oracle created.

33.    Oracle's data for applicants recruited and hired through its college recruiting program is unreliable. One of the flaws with Oracle's applicant data is that it is incomplete. For example, Oracle failed to maintain and provide to OFCCP data for all applicants who it considered for PT1 positions through its college recruiting program. Moreover, the database Oracle used to track college recruits did not contain race or ethnicity data for the vast majority of the applicants Oracle did track.

34.    The flaws in Oracle's applicant data justify using labor market availability data to analyze Oracle's hiring practices, comparing the race and ethnicity of Oracle's hires to the race and ethnicity of persons available for hire into Oracle's PT1 job group.

35.    Since at least January 1, 2013, Oracle utilized and continued to utilize a recruiting and hiring process that discriminates against qualified non-Asians -- including African Americans or Blacks, Hispanics, and Whites -- based on race and ethnicity for positions in the PT1 job group at Oracle's headquarters in Redwood Shores, California. Oracle's college hiring program strongly preferred hiring Asians over non-Asians, under-hiring African American or Black, Hispanic and White individuals relative to the available labor pool.

36.    After obtaining data for the years 2013 through 2016, as well as Oracle policies for its college recruiting program, OFCCP compared the race and ethnicity of actual hires at Oracle to an availability pool constructed from data specific to the schools and degrees targeted by Oracle. That comparison revealed that in every year and in the aggregate, Asians are statistically significantly more likely to be hired than available non-Asians into the PT1 job group at Oracle's headquarters. The data produced during this

enforcement action, indicates that between 2013 and 2016, Oracle hired approximately 500 recent college graduates into its PT1 job group at its headquarters. It also reveals that 90% of the recent college graduates Oracle hired for these positions were Asian, even though less than 65% of the graduates at the schools where Oracle recruited and who had the decrees Oracle targeted were Asian. Oracle's hiring practices had a statistically significant adverse impact against non-Asians.

37.    Moreover, the data analyzed thus far shows that Oracle only hired 5 Hispanic college graduates into its PT1 job group at its headquarters out of close to 500 hires, and hired zero Hispanics in 2015. Similarly, Oracle only hired six Black or African American college graduates into its PT1 job group at its headquarters from 2013 through 2016, and hired zero Black or African American college graduates in 2016. Oracle's under hiring of White and Hispanic applicants is statistically significant, and is responsible for Oracle's failure to hire more than 100 qualified, non-Asian recent college or university graduates.

| Race/Ethnicity | Total Hires | Group Hires | % Hires | Availability |
|---|---|---|---|---|
| Asian v. non-Asian | 495 | 446 | 90.1% | 64.5% |
| White v. Asian | | 30 | 6.3% | 27.6% |
| Hispanic v. Asian | | 5 | 1.1% | 5.72% |

**Table 7: analysis of the hiring of recent college graduates into PT1 jobs**

38.    While Oracle refused to produce complete data showing the students it hired who had been studying in the United States pursuant to student visas, the data and documents provided to date shows that Oracle strongly favored hiring students studying in the United States pursuant to student visas, the vast majority of whom were Asian. This strong preference for a workforce that is dependent on Oracle for authorization to work in the United States contributes to Oracle's suppression of Asian employees' wages.

39.    Oracle further increased its hires of Asian recent college graduates by hiring

approximately 15 additional Asians each year directly from India through a campus hiring program solely for graduates of colleges in India.

40.    Oracle has not produced data for the years 2017 through 2018, or documents showing it remedied or otherwise made changes to its compensation or hiring practices that would reduce the disparities OFCCP found. It is inferred that the discrimination described in Paragraphs 13-39 has continued to the present.

41.    Oracle's compensation and hiring practices as described in paragraphs 12-40 constitute violations of the non-discrimination obligations in the Executive Order, and the related regulations at 41 C.F.R. Part 60, including 41 C.F.R. § 60-1.4(a)(1).

## REFUSAL TO PRODUCE RELEVANT DATA AND RECORDS DURING COMPLIANCE EVALUATION

42.    As part of the compliance evaluation, OFCCP requested data and documents from Oracle relevant to the agency's determination of whether Oracle had complied with the Executive Order.

43.    Regulations require federal contractors like Oracle to maintain personnel and employment records and supply such records to OFCCP upon request. *See* 41 C.F.R. § 60-1.12, 60-1.43, 60-2.32, 60-3.4; *see also* Government Contractors, Affirmative Action Requirements, 62 Fed. Reg. 44174, 44178 (Aug. 19, 1997). Despite its obligations, during the compliance review, Oracle failed to supply records requested by OFCCP. Specifically, Oracle refused to produce:

a.    compensation data for 2013,

b.    applicant and hiring data for 2012,

c.    data showing personnel actions providing job and salary information (such as starting job title, starting salary, and wage increases) for employees,

d.    analyses of Oracle's total employment process as required by 41 C.F.R.

§ 60-2.17 (including analyses of its compensation system, personnel activity, and selection and recruitment procedures to determine if disparities existed based on race, ethnicity, or gender), and

e. application materials for those who applied for jobs during the review period.

44.     Oracle continues to refuse to produce any detailed analysis of its compensation structure, conducted pursuant to 41 C.F.R. § 60-2.17(b)-(d), despite acknowledging that such records exist in response to discovery requests from OFCCP. Moreover, Oracle failed to provide any evidence that it complied with the other requirements of 41 C.F.R. § 60-2.17, or conducted an adverse impact analyses required by 41 C.F.R. §§ 60-3.15A and 60-3.4.

45.     Oracle admits it failed to collect and maintain information required by 41 C.F.R. § 60-1.12[3] and the Internet Applicant Rule (41 C.F.R. § 60-1.3, 70 FR 58946-01, Obligation to Solicit Race and Gender Data for Agency Enforcement Purposes (2005)). Specifically:

a.     Oracle failed to retain resumes and other information about persons who expressed interest in Oracle's college recruiting program and met the basic qualifications for those positions. Oracle continued to delete an email inbox used by college recruits to submit their resumes to Oracle through at least 2016 – four years after OFCCP initiated its investigation. Oracle also deleted the subfolder to this email inbox, which contained the emails and resumes of applicants that Oracle determined met the basic qualifications for its college recruiting program and sent to Oracle's Vice President of College Recruiting for further review. Nor did Oracle retain a record of all these Internet

---

[3] At this time, OFCCP is only pursuing a hiring claim focused on Oracle's college and university hiring program. If discovery or additional analysis of existing data reveals additional discrimination in Oracle's hiring of experienced applicants, OFCCP will amend its Complaint accordingly.

Applicants in its college recruiting database, since Oracle only input
information about applicants approved after subsequent screening by its Vice
President of College Recruiting.

b.   Oracle's college recruiting database is further flawed, because Oracle
failed to solicit race, ethnicity, and gender information from the subset of
college applicants it did input into its college recruiting database.   Oracle's
college recruiting database only includes race information for approximately
12% of the applicants.

46.     Oracle's failure to even collect and maintain information regarding all
Internet Applicants to Oracle's college recruiting program reveals that the applicant and
hiring data Oracle produced during the compliance review was deeply flawed, Oracle
failed to conduct the analysis of Oracle's recruiting and hiring practices required by the
regulations, and failed to comply with its obligations to develop an Affirmative Action
Program. *See* 41 C.F.R. §§ 60-1.12(a), and 41 C.F.R. Parts 60-2 and 60-3.

47.     There is a presumption that the information Oracle has refused to produce
or destroyed was unfavorable to Oracle, supporting the allegations in this Complaint. *See*
41 C.F.R. § 60-1.12(e).

48.     Oracle's refusal to supply the records as described in paragraphs 43-47,
despite being required to make, keep and produce this information, constitutes a violation
of 41 C.F.R. §§ 60-1.12, 2.32,  and generally 41 C.F.R. Parts 2, 3.

49.     Unless restrained by an administrative order, Oracle will continue to violate
its obligations under Executive Order 11246.

### PRAYER FOR RELIEF

**BASED ON THE FOREGOING**, Plaintiff OFCCP requests a decision and order
pursuant to 41 C.F.R. Part 60-30, finding that Oracle's compensation and hiring policies

violate Executive Order 11426 and providing the following relief:

      (a)   permanently enjoining Oracle, its successors, officers, agents, servants, employees, divisions, subsidiaries and all persons in active concert or participation with them from violating the Executive Order.  This Order should include provisions enjoining Oracle from failing to correct its biased and discriminatory pay system and hiring system to prevent future discrimination, including at least pay adjustments for current employees affected by Oracle's illegal pay practices and additional hiring to offset its discriminatory hiring practices; and it should include provisions enjoining Oracle from failing to correct its recordkeeping practices and procedures to maintain and supply to OFCCP employment records as required by the Executive Order;

      (b)   an order canceling all of Oracle's federal government contracts and subcontracts and those of its officers, agents, successors, divisions, subsidiaries and those persons in active concert or participation with them, and declaring said persons and entities ineligible for the extension or modification of any such existing Government contract or subcontract;

      (c)   an order debarring Oracle and its officers, agents, servants, successors, divisions and subsidiaries and those persons in active concert or participation with them from entering into future federal government contracts and subcontracts until such time as Oracle satisfies the Deputy Assistant Secretary for Federal Contract Compliance Programs that it has undertaken efforts to remedy its prior noncompliance and is currently in compliance with the provisions of the Executive Order and the regulations issued pursuant thereto;

      (d)   an order requiring Oracle to provide complete relief to the affected classes, including lost compensation, interest, and all other benefits of employment resulting from Oracle's discrimination; and

      (e)   any other relief as justice may require.

Respectfully submitted,

Date: January 22, 2019

KATE S. O'SCANNLAIN
Solicitor of Labor

JANET M. HEROLD
Regional Solicitor

JEREMIAH MILLER
Acting Counsel for Civil Rights

LAURA C. BREMER
Senior Trial Attorney
UNITED STATES DEPARTMENT OF LABOR
Office of the Solicitor
90 7th Street, Suite 3-700
San Francisco, CA 94103
Telephone: (415) 625-7757
Fax: (415) 625-7772
E-Mail: Bremer.Laura@dol.gov

*Attorneys for Plaintiff*

EXHIBIT A

**U.S. Department of Labor**     Office of Federal Contract Compliance Programs
Greater San Francisco/Bay District Office
90 7ᵗʰ Street, Suite 11-100
San Francisco, CA 94103



March 11, 2016

**VIA CERTIFIED MAIL,**
**7015 0640 0001 2393 5541**
**(RETURN RECEIPT REQUESTED)**

Safra A. Catz
Mark Hurd
Chief Executive Officers
ORACLE America, Inc.
500 Oracle Parkway
Redwood Shores, CA 94065

RE:   **COMPLIANCE EVALUATION OF ORACLE AMERICA, INC.,**
      **REDWOOD SHORES, CALIFORNIA; OFCCP NO. R00192699**

Dear Ms. Catz and Mr. Hurd:

The United States Department of Labor ("DOL"), Office of Federal Contract Compliance Programs
("OFCCP"), is conducting a compliance evaluation of ORACLE America, Inc. ("ORACLE") in
Redwood Shores, California pursuant to 41 Code of Federal Regulations ("C.F.R.") Chapter 60:
Executive Order 11246, as amended ("E.O. 11246"); Section 503 of the Rehabilitation Act of 1973, as
amended ("Section 503"); and the Vietnam Era Veterans' Readjustment Assistance Act of 1974, as
amended ("VEVRAA").

OFCCP found that ORACLE violated E.O. 11246. Consequently, OFCCP is issuing this Notice of
Violations to ORACLE. ORACLE's violations, and the corrective actions required to remedy them, are
set forth below.

**HIRING DISCRIMINATION (VIOLATION 1)**

**1. VIOLATION:**

During the review period from January 1, 2013 through June 30, 2014, ORACLE discriminated
against qualified African American, Hispanic and White (hereinafter "non-Asians") applicants in
favor of Asian applicants, particularly Asian Indians, based upon race in its recruiting and hiring
practices for Professional Technical 1, Individual Contributor ("PT1") roles, in violation of 41
C.F.R. 60-1.4(a)(1).

Specifically, during the period of January 1, 2013 through June 30, 2014, ORACLE recruited
approximately 6800 applicants to PT1 roles. Of those applicants, ORACLE recruited 2% African



Americans, 2.5% Hispanics, 19% Whites and 76% Asian applicants. Of the Asian applicants, Asian Indians were nearly 70% of Asian applicants and over 50% of all applicants in PT1.[1]

An analysis of ORACLE's applicant data and appropriate workforce availability statistics[2] show that ORACLE favored Asian applicants, particularly Asian Indians, in recruiting at a standard deviation as significant as +85. ORACLE disfavored non-Asian applicants in recruiting, particularly African American, Hispanic and White applicants, at standard deviations as significant as -8, -10, and -80, respectively.

Additionally, during the period of January 1, 2013 through June 30, 2014, ORACLE hired approximately 670 applicants into PT1 roles. Of those hires, ORACLE hired 1% African Americans, 2% Hispanics, 14% Whites, and 82% Asian applicants. Of the Asian hires, Asian Indians were nearly 60% of Asian hires and 45% of all hires in PT1.

An analysis of ORACLE's hiring data and appropriate workforce availability statistics[3] show that ORACLE favored Asian applicants, particularly Asian Indians, in hiring at a standard deviation as significant as +30. ORACLE disfavored non-Asian applicants in hiring, particularly African American, Hispanic and White applicants, at standard deviations as significant as -4, -3, and -28, respectively.

Evidence gathered during the compliance evaluation demonstrates that ORACLE's discriminatory recruiting and hiring practices skewed the racial composition of the applicant flow data to favor Asians, particularly Asian Indians, and disfavored other racial groups for PT1 roles. In order to further analyze ORACLE's recruitment and hiring practices for PT1 roles, OFCCP made multiple requests to ORACLE for copies of all application materials for all expressions of interest, including but not limited to hiring managers, employee referrals, requisition dates, hire dates, and copies of job postings and job requirements. Because ORACLE failed to provide complete and accurate information in response to OFCCP's multiple requests, OFCCP presumes that the information not produced would have been unfavorable to ORACLE.

Based upon the analysis conducted and the evidence gathered during the compliance evaluation, OFCCP finds that ORACLE recruited, selected and hired Asian applicants, particularly Asian Indians, for PT1 roles at a rate significantly greater than their non-Asian counterparts who were equally or more qualified for the roles. ORACLE's recruiting and hiring practices resulted in unlawful discrimination against non-Asian applicants based upon race, particularly African American, Hispanic and White applicants.

---

[1] Asian Indians make-up less than 1% of the U.S. population. *Asians in the U.S. labor force: profile of a diverse population*, U.S. DOL, Bureau of Labor Statistics, Monthly Labor Review, November 2011, http://www.bls.gov/opub/mlr/2011/11/art1full.pdf.

[2] Availability statistics for the Software Developers, Applications & Systems Software Occupation in the United States is based upon 2006-2010 Census and/or 2013-2014 DOL, Bureau of Labor Statistics' Labor Force Statistics.

[3] See footnote 2.



Notice of Violations
OFCCP No. R00192699
Page 3 of 9

## CORRECTIVE ACTION:

ORACLE must agree to revise its personnel practices and procedures to ensure that the qualified non-Asian applicants for the PT1 roles are afforded equal employment opportunity for recruitment and selection. ORACLE must also agree to provide the following "make-whole relief" to the non-Asian applicants.

a) Notice: Send notification to the class members to inform them of their rights and the potential remedies.

b) Job Offer: Make bona-fide job offers on a priority basis at the rate of pay that class members would now be earning had ORACLE hired them on the date of the first opportunity following their application.

c) Monetary Settlement: Provide back pay plus quarterly compounded interest at the IRS underpayment rate for the class members. Back pay will be calculated from the date class members should have been hired to the date the violation is resolved in a signed Conciliation Agreement or a bona fide job offer is made to the respective class members. Provide any and all employment benefits that the class members would have received had it not been for the discrimination described above; and

d) Policies and Training: Develop recruitment and hiring policies that comply with Executive Order 11246, as amended, and its implementing regulations; provide mandatory training on the policies to supervisory, management and recruitment professionals involved in ORACLE's recruitment and selection process; and evaluate performance and compensation of supervisory, management and recruitment professionals based upon compliance with the policies.

## COMPENSATION DISCRIMINATION (VIOLATIONS 2-5)

## 2. VIOLATION:

Beginning no later than January 1, 2013, and continuing thereafter, ORACLE discriminated against female employees in Information Technology, Product Development, and Support roles based upon sex by paying them less than comparable males employed in similar roles, in violation of 41 C.F.R. 60-1.4(a)(1).[4]

During the compliance review, OFCCP reviewed employment policies, practices, and records; interviewed management, human resources, and non-management employees; examined employee complaints; analyzed individual employee compensation data and other evidence; and conducted an onsite inspection of the worksite. Based upon the evidence gathered during the compliance review,

---

[4] ORACLE refused to provide OFCCP with complete compensation data for all relevant employees, including contract and contingent employees, for the full review period. ORACLE also did not provide any data demonstrating that its continuing compensation disparities have been remedied. Accordingly, OFCCP presumes such data would be unfavorable to ORACLE.

OFCCP evaluated and analyzed ORACLE's compensation system and, through regression and other analysis, found statistically significant pay disparities based upon sex after controlling for legitimate explanatory factors. The results of OFCCP's regression analyses are attached. (Attachment A).

Based upon the analysis conducted and the evidence gathered during the compliance evaluation, OFCCP finds that ORACLE paid male employees in Information Technology, Product Development, and Support roles at a rate significantly greater than their female counterparts who were equally or more qualified. ORACLE's compensation practices resulted in unlawful discrimination against female employees based upon sex.

**CORRECTIVE ACTION:**

ORACLE must agree to take steps to ensure that its compensation system is nondiscriminatory to all of its employees, regardless of sex. This applies to all aspects of compensation, including but not limited to, salary at the time of placement into roles, annual salary adjustments and incentive compensation in Information Technology, Product Development, and Support roles. ORACLE agrees to: 1) cease the discriminatory compensation practice(s) resulting in lower pay and adverse impact against females in Information Technology, Product Development, and Support roles; 2) provide make-whole remedies to the class of females to include back pay, interest, and other employment benefits; and 3) provide training to employees involved in setting and increasing compensation to ensure that the violation does not recur.

3. **VIOLATION:**

Beginning no later than January 1, 2013, and continuing thereafter, ORACLE discriminated against African Americans in Product Development roles based upon race by paying them less than comparable Whites employed in similar roles, in violation of 41 C.F.R. 60-1.4(a)(1).[5]

During the compliance review, OFCCP reviewed employment policies, practices, and records; interviewed management, human resources, and non-management employees; examined employee complaints; analyzed individual employee compensation data and other evidence; and conducted an onsite inspection of the worksite. Based upon the evidence gathered during the compliance review, OFCCP evaluated and analyzed ORACLE's compensation system and, through regression and other analysis, found statistically significant pay disparities based upon race after controlling for legitimate explanatory factors. The results of OFCCP's regression analysis are attached. (Attachment A).

Based upon the analysis conducted and the evidence gathered during the compliance evaluation, OFCCP finds that ORACLE paid White employees in Product Development roles at a rate significantly greater than their African American counterparts who were equally or more qualified. ORACLE's compensation practices resulted in unlawful discrimination against African American employees based upon race.

---

[5] See footnote 4.

**CORRECTIVE ACTION:**

ORACLE must agree to take steps to ensure that its compensation system is nondiscriminatory to all of its employees, regardless of race. This applies to all aspects of compensation, including but not limited to, salary at the time of placement into roles, annual salary adjustments and incentive compensation in Product Development roles. ORACLE agrees to: 1) cease the discriminatory compensation practice(s) resulting in lower pay and adverse impact against African Americans in Product Development roles; 2) provide make-whole remedies to the class of African Americans to include back pay, interest, and other employment benefits; and 3) provide training to employees involved in setting and increasing compensation to ensure that the violation does not recur.

4. **VIOLATION:**

Beginning no later than January 1, 2013, and continuing thereafter, ORACLE discriminated against Asians in Product Development roles based upon race by paying them less than comparable Whites employed in similar roles, in violation of 41 C.F.R. 60-1.4(a)(1).[6]

During the compliance review, OFCCP reviewed employment policies, practices, and records; interviewed management, human resources, and non-management employees; examined employee complaints; analyzed individual employee compensation data and other evidence; and conducted an onsite inspection of the worksite. Based upon the evidence gathered during the compliance review, OFCCP evaluated and analyzed ORACLE's compensation system and, through regression and other analysis, found statistically significant pay disparities based upon race after controlling for legitimate explanatory factors. The results of OFCCP's regression analysis are attached. (**Attachment A**).

Based upon the analysis conducted and the evidence gathered during the compliance evaluation, OFCCP finds that ORACLE paid White employees in Product Development roles at a rate significantly greater than their Asian counterparts who were equally or more qualified. ORACLE's compensation practices resulted in unlawful discrimination against Asian employees based upon race.

**CORRECTIVE ACTION:**

ORACLE must agree to take steps to ensure that its compensation system is nondiscriminatory to all of its employees, regardless of race. This applies to all aspects of compensation, including but not limited to, salary at the time of placement into roles, annual salary adjustments and incentive compensation in Product Development roles. ORACLE agrees to: 1) cease the discriminatory compensation practice(s) resulting in lower pay and adverse impact against Asians in Product Development roles; 2) provide make-whole remedies to the class of Asians to include back pay, interest, and other employment benefits; and 3) provide training to employees involved in setting and increasing compensation to ensure that the violation does not recur.

---

[6] See footnote 4.

## 5. VIOLATION:

Beginning no later than January 1, 2013, and continuing thereafter, ORACLE discriminated against Americans in Product Development and Support roles based upon national origin by paying them less than comparable non-Americans employed in similar roles, in violation of 41 C.F.R. 60-1.4(a)(1).[7]

During the compliance review, OFCCP reviewed employment policies, practices, and records; interviewed management, human resources, and non-management employees; examined employee complaints; analyzed individual employee compensation data and other evidence; evaluated public disclosure files and related wage determination memoranda; and conducted an onsite inspection of the worksite. Based upon the evidence gathered during the compliance review, OFCCP evaluated and analyzed ORACLE's compensation system and, through regression and other analysis, found statistically significant pay disparities based upon national origin after controlling for legitimate explanatory factors. The results of OFCCP's regression analysis are attached. (Attachment A).

Based upon the analysis conducted and the evidence gathered during the compliance evaluation, OFCCP finds that ORACLE paid non-American employees in Product Development and Support roles at a rate significantly greater than their American counterparts who were equally or more qualified. ORACLE's compensation practices resulted in unlawful discrimination against American employees based upon national origin.

### CORRECTIVE ACTION:

ORACLE must agree to take steps to ensure that its compensation system is nondiscriminatory to all of its employees, regardless of national origin. This applies to all aspects of compensation, including but not limited to, salary at the time of placement into roles, annual salary adjustments and incentive compensation in Product Development and Support roles. ORACLE agrees to: 1) cease the discriminatory compensation practice(s) resulting in lower pay and adverse impact against Americans in Product Development and Support roles; 2) provide make-whole remedies to the class of Americans to include back pay, interest, and other employment benefits; and 3) provide training to employees involved in setting and increasing compensation to ensure that the violation does not recur.

## AFFIRMATIVE ACTION VIOLATIONS (VIOLATIONS 6-8)

## 6. VIOLATION:

ORACLE failed to perform an in-depth analysis of its total employment processes to determine whether and where impediments to equal employment opportunity exist as required by 41 C.F.R. 60-2.17(b)(3). Specifically, ORACLE failed to identify problem areas in its compensation system(s) to determine whether sex or race based disparities existed.

---

[7] See footnote 4.

**CORRECTIVE ACTION:**

ORACLE must agree to perform in-depth analyses of its total employment processes to determine whether and where impediments to equal employment opportunity exist. ORACLE must agree to evaluate its compensation system(s), specifically base salary, bonus programs, starting wages, pay increases, restricted stock units (RSU) or other stock awards, promotions relative to pay, and any other benefits, to determine whether there are sex, race or national origin based pay disparities. ORACLE will incorporate these analyses and determinations into its current AAP and will update these analyses at least annually and incorporate them into future AAPs.

7. **VIOLATION:**

ORACLE failed to demonstrate good faith efforts to develop and execute action-oriented programs designed to correct pay disparities as of January 1, 2013. Specifically, ORACLE was unable to demonstrate that it had conducted any pay equity analyses, or otherwise attempted to correct the problem areas identified in 41 C.F.R. 60-2.17(b)(3) in violation of 41 C.F.R. 60-2.17(c).

**CORRECTIVE ACTION:**

ORACLE must agree to conduct an in-depth analysis of its total employment processes to determine whether any impediments to equal opportunity exist. ORACLE must then develop and implement action-oriented programs designed to remove any identified impediments and institute salary adjustment procedures to determine where and how equity adjustments should be made to ensure nondiscrimination.

8. **VIOLATION:**

ORACLE failed to develop and implement an internal audit and reporting system that periodically measured the effectiveness of its total affirmative action program as required by 41 C.F.R. 60-2.17(d). Specifically, ORACLE failed to monitor its records of all personnel activities, such as compensation, at all levels to ensure its nondiscriminatory policy was carried out.

**CORRECTIVE ACTION:**

ORACLE must agree to implement an internal audit and reporting system to periodically measure the effectiveness of its total affirmative action program. ORACLE must agree to take the following corrective actions:

a) Monitor records of all personnel activity, such as all components of compensation, to ensure the non-discriminatory policy is enforced;

b) Require internal reporting on a scheduled basis as to the degree to which equal employment opportunity and organizational objectives are attained;

c) Review reports with all levels of management;



d) Advise top management about the effectiveness of the equal employment opportunity program and submit recommendations to improve any unsatisfactory performance; and

e) Provide training to all employees who participate in any component of ORACLE's compensation system(s).

## RECORDKEEPING AND ACCESS VIOLATIONS (VIOLATION 9-10)

### 9. VIOLATION:

ORACLE failed to collect and maintain personnel and employment records and conduct adverse impact analyses in accordance with the requirements of 41 C.F.R. 60-1.12(a) and Part 60-3. Additionally, ORACLE failed to conduct the adverse impact analyses required by 41 C.F.R. 60-3.15A and 60-3.4.

### CORRECTIVE ACTION:

ORACLE will ensure that its records are collected and maintained in accordance with the requirements of 41 C.F.R. 60-1.12(a) and Part 60-3. ORACLE will conduct adverse impact analyses on at least an annual basis for the purpose of determining whether adverse impact exists against applicants based on race, sex, or national origin/ethnic group in hiring, promotion, termination, and other personnel activities. These analyses will be done by job for each group constituting more than 2% of the labor force in the relevant labor area or 2% of the applicable workforce. If adverse impact is identified in the total selection process, ORACLE will evaluate each individual component of the selection process for adverse impact. If adverse impact is found to exist in any of the individual components of the selection process, ORACLE will validate each such component in accordance with the Uniform Guidelines on Employee Selection Procedures or utilize selection procedures which do not result in adverse impact.

### 10. VIOLATION:

ORACLE denied OFCCP access to records, including prior year compensation data for all employees and complete hiring data for PT1 roles during the review period of January 1, 2013 through June 30, 2014, which are relevant to the matter under investigation and pertinent to ORACLE's compliance with Executive Order 11246, as amended, and the regulatory requirements at 41 C.F.R. 60-1.12; 60-1.20; 60-1.43; 60-2.32 and 60-3.4.

### CORRECTIVE ACTION:

ORACLE must immediately provide to OFCCP all relevant compensation and hiring data, which was requested on April 27, 2015, May 11, 2015, May 28, 2015, July 30, 2015, October 1, 2015, October 14, 2015, November 2, 2015, and December 15, 2015.

Finally, please note that nothing herein is intended to relieve ORACLE from the obligation to comply with the requirements of E.O. 11246, Section 503, and/or VEVRAA, their implementing regulations, or any other equal employment opportunity/ nondiscrimination statute, executive order or regulation. In addition, this Notice of Violation in no way limits the applicability of the revised regulations implementing Section 503, 41 C.F.R. Part 60-741 (2014) and the revised regulations implementing VEVRAA, 41 C.F.R. Part 60-300 (2014).

\*\*\*\*\*

In order to come into compliance, ORACLE must enter into a binding Conciliation Agreement with OFCCP that encompasses all of the corrective actions described above. It is our desire to avoid enforcement proceedings. You may contact me at (415) 625-7839 within five (5) business days of receipt of this letter if ORACLE would like to begin conciliation and resolution of the specified violations.

Sincerely,

Robert Doles
District Director

cc:     Shauna Holman-Harries (*via* email: shauna.holman.harries@ORACLE.com)
Director Diversity Compliance, Oracle America, Inc.

Juana Schurman (*via* email: juana.schurman@ORACLE.com)
Vice President and Associate General Counsel, Oracle America, Inc.

Gary R. Siniscalco (*via* email: grsiniscalco@orrick.com)
Orrick Herrington & Sutcliffe LLP

Enclosure

## ATTACHMENT A

### COMPENSATION DISCRIMINATION (VIOLATIONS 2-5)

Analysis of Employees' Annual Salary and Gender

The United States Department of Labor, Office of Federal Contract Compliance Programs ("OFCCP") conducted statistical analysis of the employment records Oracle America, Inc. ("Oracle") provided to OFCCP during its equal employment opportunity investigation of Oracle's facility in Redwood Shores, California. OFCCP analyzed Oracle employees' compensation data by Oracle job function using a model that included the natural log of annual salary as a dependent variable, and accounted for differences in employees' gender, work experience at Oracle, work experience prior to Oracle, full-time/part-time status, exempt status, global career level, job specialty, and job title.

As displayed in the table below, the results of the analysis show a statistically significant salary disparity adverse to female employees in *Information Technology*, *Product Development*, and *Support* roles.

### Regression Analysis of Female and Male Employees' Salary Difference at Oracle

| Year[1] | Class | Number of Female Class Members | Standard Deviations |
|---|---|---|---|
| 2014 | Female *Information Technology* Employees | 133 | -2.71 |
| 2014 | Female *Product Development* Employees | 1,207 | -8.41 |
| 2014 | Female *Support* Employees | 47 | -3.67 |

---

[1] Oracle provided OFCCP with one year of compensation data that included Oracle employees who were employed at the relevant facility on January 1, 2014. Oracle refused to provide OFCCP with its prior year compensation data.

## Analysis of Employees' Annual Salary and Race

The United States Department of Labor, OFCCP conducted statistical analysis of the employment records Oracle provided to OFCCP during its equal employment opportunity investigation of Oracle's facility in Redwood Shores, California. OFCCP analyzed Oracle employees' compensation data by Oracle job function using a model that included the natural log of annual salary as a dependent variable, and accounted for differences in employees' race, work experience at Oracle, work experience prior to Oracle, full-time/part-time status, exempt status, global career level, job specialty, and job title.

As displayed in the table below, the results of the analysis show a statistically significant salary disparity adverse to African American and Asian employees in *Product Development* roles.

**Regression Analysis of African American and White Employees'
Salary Difference at Oracle**

| Year[2] | Class | Number of Black Class Members | Standard Deviations |
|---|---|---|---|
| 2014 | African American *Product Development* Employees | 27 | -2.10 |

**Regression Analysis of Asian and White Employees'
Salary Difference at Oracle**

| Year[3] | Class | Number of Asian Class Members | Standard Deviations |
|---|---|---|---|
| 2014 | Asian *Product Development* Employees | 3,086 | -6.55 |

---

[2] Oracle provided OFCCP with one year of compensation data that included Oracle employees who were employed at the relevant facility on January 1, 2014. Oracle refused to provide the Agency prior year compensation data.

[3] Oracle provided OFCCP with one year of compensation data that included Oracle employees who were employed at the relevant facility on January 1, 2014. Oracle refused to provide the Agency prior year compensation data.

2

## Analysis of Employees' Annual Salary and National Origin

The United States Department of Labor, OFCCP conducted statistical analysis of the employment records Oracle provided to OFCCP during its equal employment opportunity investigation of Oracle's facility in Redwood Shores, California. OFCCP analyzed Oracle employees' compensation data by Oracle job function using a model that included the natural log of annual salary as a dependent variable, and accounted for differences in employees' national origin, work experience at Oracle, work experience prior to Oracle, full-time/part-time status, exempt status, global career level, job specialty, visa status, and job title.

As displayed in the table below, the results of the analysis show a statistically significant salary disparity adverse to American employees in *Product Development* and *Support* roles.

### Regression Analysis of American and Non-American Employees' Salary Difference at Oracle

| Year[4] | Class | Number of American Class Members | Standard Deviations |
|---------|-------|----------------------------------|---------------------|
| 2014 | American Product Development Employees | 3,501 | -7.07 |
| 2014 | American Support Employees | 185 | -3.65 |

---

[4] Oracle provided OFCCP with one year of compensation data that included Oracle employees who were employed at the relevant facility on January 1, 2014. Oracle refused to provide the Agency prior year compensation data.

3