**BOTTINI & BOTTINI, INC.**
Francis A. Bottini, Jr. (SBN 175783)
 *fbottini@bottinilaw.com*
Yury A. Kolesnikov (SBN 271173)
 *ykolesnikov@bottinilaw.com*
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone:   (858) 914-2001
Facsimile:    (858) 914-2002

**RENNE PUBLIC LAW GROUP**
Louise H. Renne (SBN 36508)
 *lrenne@publiclawgroup.com*
Ruth Bond (SBN 214582)
 *rbond@publiclawgroup.com*
Steve Cikes (SBN 235413)
 *scikes@publiclawgroup.com*
Imran Dar (SBN 296182)
 *idar@publiclawgroup.com*
350 Sansome Street, Suite 300
San Francisco, California  94104
Telephone:   (415) 848-7200
Facsimile:    (415) 848-7230

*Lead Counsel for Plaintiffs*

[Additional counsel listed on signature page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| R. ANDRE KLEIN *et al.*, derivatively on behalf of ORACLE CORPORATION and ORACLE AMERICA, INC., <br><br> Plaintiffs, <br><br> vs. <br><br> LAWRENCE J. ELLISON, *et al.*, <br><br> Defendants, <br><br> – and – <br><br> ORACLE CORPORATION and ORACLE AMERICA, INC, <br><br> Nominal Defendants. | Lead Case No. 3:20-cv-04439-JSC <br><br> **Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendants' Motion to Dismiss the Complaint** <br><br> Hearing Date:   April 8, 2021 <br> Time:               9:00 a.m. <br> Judge:             Hon. Jacqueline Scott Corley <br> Courtroom:      Courtroom E, 15th Floor |

# Table of Contents

I.    ISSUES TO BE DECIDED ............................................................................... 1

II.   PRELIMINARY STATEMENT ........................................................................ 1

III.  BACKGROUND ............................................................................................. 3

    A.    The Company and Its Governance ......................................................... 3

    B.    Defendants Had Knowledge of the Company's Discriminatory and
        Unlawful Practices but Resisted and Obstructed Change ........................ 3

    C.    Proxy Disclosures Mandated by the SEC ............................................... 5

    D.    Defendants Authorize the Filing of Materially Misleading Proxy Statements ....... 6

    E.    Damages to the Company ....................................................................... 8

IV.   LEGAL STANDARD ...................................................................................... 9

V.    ARGUMENT .................................................................................................. 9

    A.    The Complaint Adequately Pleads Demand Futility ............................... 9

        1.    Applicable Law ............................................................................ 9

        2.    Demand Is Futile as to Ellison .................................................... 10

        3.    Demand Is Futile as to Catz and Henley ..................................... 11

        4.    Demand Is Futile as to Conrades, James, and Seligman............... 13

            a.    Conrades ........................................................................... 14

            b.    Seligman ........................................................................... 15

            c.    James................................................................................. 16

        5.    Demand Is Futile as to at Least One of the Remaining Outside
            Directors........................................................................................ 17

            a.    Panetta .............................................................................. 18

            b.    Berg................................................................................... 19

            c.    Boskin ............................................................................... 20

            d.    Chizen ............................................................................... 21

        6.    Demand Is Futile Because All of the Directors (Except Sikka) Face a
            Substantial Likelihood of Liability for Disseminating Misleading
            Statements in the 2018 and/or 2019 Proxies........................................... 21

            a.    Breach of Fiduciary Duty Claim.................................... 21

Memorandum iso Plaintiffs' Opposition to Defendants' Motion to Dismiss

b.      Violation of Section 14(a) ............................................................ 23

c.      Defendants' Arguments to the Contrary Lack Merit ..................... 25

B.      The Complaint Adequately Alleges the Causes of Action ..................................... 29

1.      The Complaint States a Claim for Breach of Fiduciary Duty (*Count I*) ... 29

a.      Defendants Breached Their Fiduciary Duties by Disseminating Materially Misleading Proxy Statements ............. 29

b.      Defendants Breached Their Fiduciary Duty by Their Conscious Disregard of "Red Flags" of Unlawful and Discriminatory Practices ............................................................ 30

i.      The Complaint Alleges "Red Flags" ................................. 31

ii.     The Complaint Alleges Harm to the Company ................. 33

2.      The Complaint States a Claim for Aiding and Abetting (*Count II*) .......... 33

3.      The Complaint States a Claim for Abuse of Control (*Count III*) ............. 34

4.      The Complaint States a Claim for Unjust Enrichment (*Count IV*) ........... 34

5.      The Complaint States a Claim for Violation of Section 14(a) (*Count V*) .................................................................................................. 34

C.      The Court Should Refuse to Enforce Oracle's Forum-Selection Clause ............. 35

VI.     CONCLUSION ............................................................................................................. 35

Memorandum iso Plaintiffs' Opposition to Defendants' Motion to Dismiss

**Table of Authorities**

**Cases**

*Arnold v. Soc'y for Sav. Bancorp, Inc.*,
　　650 A.2d 1270 (Del. 1994) .................................................................................. 22

*Aronson v. Lewis*,
　　473 A.2d 805 (Del. 1984) ............................................................................... 9, 24

*Beam v. Stewart*,
　　845 A.2d 1040 (Del. 2004) ............................................................................... 10

*Beard Research, Inc. v. Kates*,
　　8 A.3d 573 (Del. Ch. 2010) ............................................................................... 29

*Belcom, Inc. v. Robb*,
　　1998 WL 229527 (Del. Ch. Apr. 28, 1998) ...................................................... 29

*Belova v. Sharp*,
　　2008 WL 700961 (D. Or. Mar. 13, 2008) ......................................................... 34

*Butorin v. Blount*,
　　106 F. Supp. 3d 833 (S.D. Tex. 2015) .............................................................. 35

*Cinerama, Inc. v. Technicolor, Inc.*,
　　663 A.2d 1156 (Del. 1995) ............................................................................... 29

*Constr. Laborers Pension Trust v. CBS Corp.*,
　　433 F. Supp. 3d 515 (S.D.N.Y. 2020) .............................................................. 28

*Cottrell v. Duke*,
　　737 F.3d 1238 (8th Cir. 2013) .......................................................................... 35

*Del. Cnty. Emps. Ret. Fund v. Sanchez*,
　　124 A.3d 1017 (Del. 2015) ............................................................................... 10

*Gatz v. Ponsoldt*,
　　925 A.2d 1265 (Del. 2007) ............................................................................... 33

*Howard v. Everex Sys., Inc.*,
　　228 F.3d 1057 (9th Cir. 2000) .......................................................................... 30

*In re Abbott Labs. Derivative S'holders Litig.*,
　　325 F.3d 795 (7th Cir. 2003) ...................................................................... 31, 32

*In re AIG, Inc.*,
　　965 A.2d 763 (Del. Ch. 2009) ....................................................................... 9, 33

*In re Am. Apparel, Inc.*,
　　2015 U.S. Dist. LEXIS 191466 (C.D. Cal. Apr. 28, 2015) .............................. 25

*In re Atmel Corp. Derivative Litig.*,
　　2008 WL 2561957 (N.D. Cal. June 25, 2008) .................................................. 29

Memorandum iso Plaintiffs' Opposition to Defendants' Motion to Dismiss

*In re Banco Bradesco S.A. Sec. Litig.*,
   277 F. Supp. 3d 600 (S.D.N.Y. 2017) ............................................................... 29

*In re BofI Holding, Inc. Sec. Litig.*,
   977 F.3d 781 (9th Cir. 2020) ............................................................................. 26

*In re Caremark Int'l Inc. Derivative Litig.*,
   698 A.2d 959 (Del. Ch. 1996) ........................................................................... 30

*In re Cornerstone Therapeutics, Inc.*,
   115 A.3d 1173 (Del. 2015) ................................................................................ 11

*In re Countrywide Fin. Corp. Derivative Litig.*,
   554 F. Supp. 2d 1044 (C.D. Cal. 2008) ................................................ 11, 24, 28, 33

*In re Ebix, Inc. Stockholder Litig.*,
   2014 Del. Ch. LEXIS 132 (Del. Ch. July 24, 2014) ........................................... 22

*In re Goldman Sachs Grp., Inc. S'holder Litig.*,
   2011 Del. Ch. LEXIS 151 (Del. Ch. Oct. 12, 2011) ........................................... 12

*In re infoUSA, Inc. S'holders Litig.*,
   953 A.2d 963 (Del. Ch. 2007) ................................................................. 22, 23, 30

*In re Johnson & Johnson Derivative Litig.*,
   865 F. Supp. 2d 545 (D.N.J. 2011) .................................................................... 32

*In re NutriSystem, Inc. Derivative Litig.*,
   666 F. Supp. 2d 501 (E.D. Pa. 2009) ................................................................. 12

*In re Omnicare, Inc. Sec. Litig.*,
   769 F.3d 455 (6th Cir. 2014) ............................................................................. 27

*In re Oracle Corp. Derivative Litig.*,
   2018 Del. Ch. LEXIS 92 (Del. Ch. Mar. 19, 2018) ................................... *passim*

*In re Pfizer Inc. S'holder Derivative Litig.*,
   722 F. Supp. 2d 453 (S.D.N.Y. 2010) ........................................................... 31, 32

*In re Reliance Sec. Litig.*,
   91 F. Supp. 2d 706 (D. Del. 2000) .................................................................... 25

*In re Reliance Sec. Litig.*,
   135 F. Supp. 2d 480 (D. Del. 2001) ................................................................... 25

*In re Shoe-Town, Inc. Stockholders Litig.*,
   1990 WL 13475 (Del. Ch. Feb. 12, 1990) ...................................................... 33, 34

*In re Signet Jewelers Ltd. Sec. Litig.*,
   2018 U.S. Dist. LEXIS 199809 (S.D.N.Y. Nov. 26, 2018) ................................ 28

*In re Synchronoss Techs.*,
   2019 U.S. Dist. LEXIS 229476 (D.N.J. Nov. 26, 2019) ..................................... 23

Memorandum iso Plaintiffs' Opposition to Defendants' Motion to Dismiss

*In re TASER Int'l S'holder Derivative Litig.*,
    2006 WL 687033 (D. Ariz. Mar. 17, 2006) ...................................................... 31

*In re Trump Hotels S'holder Derivative Litig.*,
    2000 U.S. Dist. LEXIS 13550 (S.D.N.Y. Sept. 21, 2000) .................................. 13

*In re Wells Fargo & Co. S'holder Derivative Litig.*,
    282 F. Supp. 3d 1074 (N.D. Cal. 2017) .......................................... 28, 30, 35

*In re Zillow Grp., Inc.*,
    2020 U.S. Dist. LEXIS 34802 (W.D. Wash. Feb. 28, 2020) ............................ 10

*In re Zoran Corp. Derivative Litig.*,
    511 F. Supp. 2d 986 (N.D. Cal. 2007) ............................................................ 24

*Kamen v. Kemper Fin. Servs., Inc.*,
    500 U.S. 90 (1991) ............................................................................................ 9

*Khoja v. Orexigen Therapeutics*,
    899 F.3d 988 (9th Cir. 2018) ...................................................................... 9, 35

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014) ........................................................................................ 35

*Malone v. Brincat*,
    722 A.2d 5 (Del. 1998) ...................................................................... 21, 29, 30

*Marvin H. Maurras Revocable Trust v. Bonfman*,
    2013 WL 53483578 (N.D. Ill. Sept. 24, 2013) ............................................... 32

*MCG Capital Corp. v. Maginn*,
    2010 Del. Ch. LEXIS 87 (Del. Ch. May 5, 2010) ..................................... 25, 26

*Melbourne Mun. Firefighters Pension Trust Fund v. Jacobs*,
    2016 WL 4076369 (Del. Ch. Aug. 1, 2016) ................................................... 32

*Merritt v. Countrywide Fin. Corp.*,
    759 F.3d 1023 (9th Cir. 2014) .......................................................................... 9

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015) .................................................................................. 27, 28

*Owens v. Kaiser Found. Health Plan, Inc.*,
    244 F.3d 708 (9th Cir. 2001) .......................................................................... 35

*Pirelli Armstrong Tire Corp., etc. v. Stumpf*,
    2012 WL 424557 (N.D. Cal. Feb. 9, 2012) .................................................... 30

*Rales v. Blasband*,
    634 A.2d 927 (Del. 1993) ............................................................................ 9, 10

*Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*,
    845 F.3d 1268 (9th Cir. 2017) ........................................................................ 27

v

*Rich ex rel. Fuqi Int'l, Inc. v. Yu Kwai Chong*,
    66 A.3d 963 (Del. Ch. 2013)...................................................................... 30

*Rosenbloom v. Pyott*,
    765 F.3d 1137 (9th Cir. 2014) .......................................................... 9, 10, 31

*Ryan v. Gifford*,
    918 A.2d 341 (Del. Ch. 2007)..................................................................... 34

*Sandys v. Pincus*,
    152 A.3d 124 (Del. 2016) .................................................................... *passim*

*Schock v. Nash*,
    732 A.2d 217 (Del. 1999) ............................................................................ 34

*Shaev v. Baker*,
    2017 U.S. Dist. LEXIS 68523 (N.D. Cal. May 4, 2017). ..................... 23, 24

*South v. Baker*,
    62 A.3d 1 (Del. Ch. 2012) ........................................................................... 30

*Stone ex rel. AmSouth Bancorp. v. Ritter*,
    911 A.2d 362 (Del. 2006) ............................................................................ 30

*Stroud v. Grace*,
    606 A.2d 75 (Del. 1992) .............................................................................. 22

*Teachers Ret. Sys. v. Aidinoff*,
    900 A.2d 654 (Del. Ch. 2006)..................................................................... 29

*UFCW & Participating Food Indus. Emp'rs Tri-State Pension Fund v. Zuckerberg*,
    2020 Del. Ch. LEXIS 319 (Del. Ch. Oct. 26, 2020).............................. 10, 11

*Unión de Empleados de Muelles de Puerto Rico PRSSA Welfare Plan v. UBS Fin. Servs. Inc.*,
    704 F.3d 155 (1st Cir. 2013) ................................................................. 11, 12

**Rules**

Fed. R. Civ. P. 23.1(b)(3) ................................................................................. 9

Memorandum iso Plaintiffs' Opposition to Defendants' Motion to Dismiss

## I.      ISSUES TO BE DECIDED

**Issue 1:**    Whether the Court should deny the motion to dismiss based on demand futility where the complaint's allegations, taken as a whole, give rise to a reasonable doubt that a majority of the Board can exercise independent and disinterested judgment in considering a demand?

**Issue 2:**    Whether the complaint adequately states a claim?

**Issue 3:**    Whether the Court should refuse to enforce a forum-selection clause where Plaintiffs' § 14(a) claim can only be litigated in federal court?

## II.      PRELIMINARY STATEMENT

Defendants' motion to dismiss does not withstand careful scrutiny.   The complaint adequately states a claim for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, abuse of control, unjust enrichment, and violation of § 14(a).  Because it has one of the least diverse Boards and workforces in America, Oracle has been the subject of two Congressional inquiries.  It has also been accused by its employees and the government of discrimination.  Because of the materiality of diversity in today's society, in 2009, the SEC adopted a rule mandating disclosures in the proxy statements regarding what role, if any, diversity plays in nominating persons to a company's board of directors.   In order to hide the truth, Oracle's proxies specifically misrepresented that Oracle was "actively seeking women and minority candidates for the pool from which director candidates are selected." ¶¶ 116–117.[1]  Through these statements, Defendants mislead shareholders in an attempt to divert attention from their own wrongdoing.  These false statements were made at a time when Oracle was facing intense scrutiny for its lack of diversity and discriminatory pay practices, including Congressional inquiries, "putting a spotlight on the company's hiring and management practices."  ¶ 9; *see also* ¶¶ 10, 54, 135, 216.  Defendants also approved statements in the 2018 and 2019 Proxies urging shareholders to vote against a proposal for an independent Chairman, despite knowing that Defendant Ellison was not independent and had engaged in a reckless personal vendetta against HP, Inc. that resulted in a $3 billion judgment against Oracle, which remains unpaid and is accruing interest at 10%.  ¶¶ 140, 143(f), 171–198.

---

[1] All "¶ __" references are to the December 7, 2020 consolidated complaint ("Complaint"). Unless otherwise noted, all citations and quotation marks are omitted, and emphasis is added.

1

Memorandum iso Plaintiffs' Opposition to Defendants' Motion to Dismiss

1    The facts pleaded easily state claims for relief.  In addition, Defendants' motion to dismiss

2  based on *forum non conveniens* fails because this Court has exclusive jurisdiction over Plaintiffs'

3  § 14(a) claim.  The Complaint also adequately pleads demand futility by alleging that a majority

4  of the board of directors ("Board") of Oracle Corporation (together with Oracle America, Inc.,

5  "Oracle" or the "Company") is unable to exercise independent and disinterested judgment.

6    Specifically, Oracle's founder, Chairman, and controlling shareholder, Larry Ellison, is

7  interested because he faces a substantial likelihood of liability for causing the Company to lie about

8  its efforts to thwart diversity on the Board and its discriminatory pay and promotion practices and

9  has uniquely benefitted from the Company's perpetuation of these discriminatory practices in the

10  form of higher dividends, yielding him $1 billion in 2019 alone.  Plaintiffs also adequately alleged

11  that Safra A. Catz (Oracle's CEO and Ellison's confidante) and Jeffrey O. Henley (Vice

12  Chairman), who derive substantial compensation from their employment at Oracle, lack

13  independence from Ellison.  Also, George H. Conrades, Naomi O. Seligman, and Renée J. James

14  have longstanding, intertwining personal and business relations with Ellison, casting reasonable

15  doubt on their ability to independently consider whether to authorize a lawsuit against Ellison.

16    Indeed, in another shareholder derivative action on behalf of Oracle, a Delaware court held

17  that these same allegations cast reasonable doubt on the ability of Catz, Henley, Conrades,

18  Seligman, and James to evaluate a demand against Ellison in an independent manner, thus

19  excusing the demand.  *See In re Oracle Corp. Derivative Litig.*, 2018 Del. Ch. LEXIS 92, at **48–

20  58 (Del. Ch. Mar. 19, 2018).  The same is true here, and at least one additional director (Leon E.

21  Panetta, Jeffrey Berg, Michael J. Boskin, or Bruce R. Chizen) similarly lacks independence from

22  Ellison, resulting in 7 out of 14 interested directors, which is all that is required to allege demand

23  futility on an even-numbered board.  Additionally, the Complaint sufficiently alleges that all of

24  the directors (except Vishal Sikka) face a substantial likelihood of liability for violations of their

25  duty of disclosure and § 14(a) of the Securities Exchange Act of 1934 due to their authorization of

26  the 2018 and 2019 proxy statements that contained materially misleading statements.

27    For all these reasons, the Court should deny Defendants' motion to dismiss.  If the Court

28  is inclined to grant the motion in any part, Plaintiffs respectfully request leave to amend.

2

### III.   BACKGROUND

**A.   The Company and Its Governance**

Oracle Corporation is a Delaware corporation that, until recently, was headquartered in Redwood Shores, California.  ¶ 29.  It enjoys the undesirable distinction of being one of the few publicly traded companies in the U.S. that has no African-Americans and no Latinos on its Board and no Asian-Americans or other minority representatives, aside from Defendant Sikka.  ¶ 6.  As noted in a Congressional letter to Oracle's Board dated November 22, 2019, "[t]he fact that African Americans make up 13% and Asian Americans make up 5.6% of the US population but 0% of Oracle's board and leadership team is inexcusable."  ¶ 77.

At the time this Complaint was filed, Oracle's Board was made up of 14 individuals: Ellison (Chairman, Chief Technology Officer, and controlling shareholder); Catz (CEO); Henley (Vice Chairman); and directors Conrades, Seligman, James, Panetta, Berg, Boskin, Chizen, Rona A. Fairhead, Charles (Wick) Moorman IV, William G. Parrett, and Sikka.  ¶¶ 31–44, 234, 242. The Board is very entrenched.  Ellison has been on the Board *since 1977*, four other directors (Catz, Henley, Berg, and Baskin) have been on the Board for *two decades*, and three additional directors (Chizen, Conrades, and Seligman) have been on the Board for *more than a decade*.

The Complaint alleges in detail that Ellison, as Oracle's founder and controlling shareholder, dominates the Board, such that no director can be appointed or reelected over his objection.  ¶¶ 241–256.  As a result, at all relevant times, the Board has simply acceded to Ellison's control, even when the actions taken on Oracle's behalf — such as the litigation with HP as a result of Ellison's personal vendetta — were detrimental to Oracle and its shareholders.  ¶¶ 181–208.

**B.   Defendants Had Knowledge of the Company's Discriminatory and Unlawful Practices but Resisted and Obstructed Change**

To say that Oracle has a sordid relationship with diversity is an understatement.  Since at least 2017, Oracle's Board had *actual knowledge* regarding allegations of discriminatory and unlawful business practices at the expense of minorities and women.  *See, e.g.*, ¶¶ 54, 96, 130.  In this time frame, Oracle has been called out twice by Congress for its lack of diversity and subjected to both a governmental enforcement action *and* a class action lawsuit, *each* of which exposed

Memorandum iso Plaintiffs' Opposition to Defendants' Motion to Dismiss

1    Oracle to $400 million dollars in liability.  ¶¶ 76–88.  Rather than address these serious issues, the

2    Board has obstructed both internal and external efforts to improve diversity.  *See, e.g.*, ¶¶ 96–100.

3           In January 2017, the Department of Labor ("DOL") brought a first-of-its-kind suit against

4    Oracle for its discriminatory practices, claiming that Oracle owed women and minorities $400

5    million because it discriminated against them by paying them less money for the same jobs, steered

6    them into lower paying jobs, and failed to hire African Americans.  ¶¶ 80, 83–89.  The suit was

7    "the biggest enforcement case" ever brought against a federal contractor.  ¶ 84.  Rather than fix its

8    discriminatory practices, Defendants engaged in scorched-earth tactics, suing the DOL and

9    attempting to interfere in the enforcement action.  ¶¶ 96–100.  Ultimately, the administrative law

10   judge presiding over the case concluded that the DOL did not meet its burden of proving intentional

11   discrimination and recommended dismissal of the complaint.  The DOL decided not to appeal.

12          On June 16, 2017, a class action against Oracle was filed in California state court ("*Jewett*

13   action"), alleging that Oracle pays women less than men for the same work.  ¶ 81.  Among other

14   things, plaintiffs allege that since June 2013, Oracle has paid 4,100 women 13% less than their

15   male counter parts, amounting to damages of approximately $400 million.  ¶ 17.  On May 1, 2020,

16   the court granted class certification.  ¶ 82.  The action is pending and exposes Oracle to $400

17   million in unpaid wages in addition to statutory and civil penalties.  ¶ 17.

18          Oracle's discriminatory practices have also brought Congressional ire.  In January 2019,

19   the Congressional Black Caucus and House Tech Caucus sent a letter to Oracle's Board expressing

20   dismay about the allegations of pay discrimination.  ¶ 9.  Thereafter, in November 2019, then-

21   representatives Robin L. Kelly, Joaquin Castro, Karen Bass, and Judy Chu demanded that Oracle

22   remedy the lack of diversity of its Board, which was inexcusable given that Oracle had "expressed

23   a commitment to diversity and rejected claims of intentional discrimination."  ¶ 77.

24          The lawsuits and Congressional attention were not unexpected.  Oracle's investors have

25   attempted to fix the Company's discriminatory practices for years.  As explained by one reporter,

26   "[f]or three straight years, shareholder Pax World Funds has filed proposals asking the company's

27   board to identify whether a gender pay gap exists and how to fix it.  The proposals have been

28   supported by several large investors, including funds held by BlackRock Inc. and State Street

4

Corp., but failed to garner majority support.  That's largely because Ellison, who owns about a third of the stock, has opposed the measure." ¶ 10; *see also* ¶¶ 124–137.

Indeed, since at least 2017, the Board has repeatedly opposed shareholder proposals that would remedy its discriminatory practices.  In 2017, 2018, and 2019, the Board caused Oracle to oppose shareholder proposals that would require the Company to identify whether a pay gap existed between its male and female employees.  ¶¶ 124–126.  Many directors played individual and active roles in opposing these resolutions.  For example, at an August 1, 2017 meeting that Ellison, Catz, Henley, Berg, Boskin, Chizen, Conrades, James, Garcia-Molina, Panetta, and Seligman attended, the Board summarily voted to oppose a shareholder proposal for a pay equity report and approved a pre-drafted statement of opposition that Vice President Higgins brought to the meeting *without much substantive discussion*.  ¶ 128.  Egregiously, the Board dismissed the need for a pay equity report *despite* the commencement in 2017 of the *Jewett* action, as well as the DOL's enforcement lawsuit.  *Id.*  Thereafter, the Board caused Oracle to issue a misleading opposition in the proxy statement to the need for a pay equity report.  ¶ 129.  The Board issued similar misleading oppositions to shareholder proposals for a pay equity report in the 2018 and 2019 proxy statements.  ¶¶ 124–127, 131–132.  The Board has also opposed impositions of term limits on its directors (some of whom have been on the Board *for* decades), which would have opened up more Board seats to minority candidates.  ¶¶ 121–123.

The Board also had knowledge that the Company's internal controls and systems were inadequate and ineffective, including with regard to discrimination in hiring, promotion, and other critical terms of employment and equal access.  ¶¶ 143(g), 145, 180.  Defendants engaged in conduct to conceal the deficient internal controls.  ¶¶ 65–66, 68.

## C.   Proxy Disclosures Mandated by the SEC

After the 2008–09 stock market crash, the SEC passed a major set of rules mandating additional proxy disclosures regarding the board nomination process, including the following:

> ***The rules as adopted require disclosure of whether, and if so how, a nominating committee considers diversity in identifying nominees for directors.***  Moreover, in what may be a regulatory first for disclosure of the inner workings of a board, ***if a nominating committee has a policy with regard to consideration of diversity, the rules require disclosure of how the policy is implemented, as well as how the nominating committee assesses the effectiveness of the policy***.

Memorandum iso Plaintiffs' Opposition to Defendants' Motion to Dismiss

¶¶ 108–109.   In enacting the rules, the SEC observed that Board diversity was material to shareholders.  ¶ 114 ("A significant number of commenters responded that disclosure about board diversity was important information to investors"; "there appears to be a meaningful relationship between diverse boards and improved corporate financial performance, and that diverse boards can help companies more effectively recruit talent and retain staff"); ¶ 115 ("Board diversity policy is an important factor in the voting decisions of some investors"; "diversity policy disclosure may also induce beneficial changes in board composition"; "[t]o the extent that boards branch out from the set of candidates they would ordinarily consider, they may nominate directors who have fewer existing ties to the board or management and are, consequently, more independent.").

**D.    Defendants Authorize the Filing of Materially Misleading Proxy Statements**

The 2019 Proxy stated the following with regard to diversity:

The Governance Committee values a diversity of backgrounds, experience, perspectives and leadership in different fields when identifying nominees.  As noted in our Corporate Governance Guidelines, ***the Governance Committee is committed to actively seeking women and minority candidates for the pool from which director candidates are chosen***.

…

As set forth in our Guidelines***, the Governance Committee***, acting on behalf of the Board, ***is committed to actively seeking women and minority candidates for the pool from which director candidates are selected***.

¶¶ 118–19.  The 2018 Proxy contained similar statements.  ¶¶ 150–152.  All the current directors (except Sikka) were on the Board when the 2019 Proxy was filed and all but two (Fairhead and Sikka) — when the 2018 Proxy was filed, and authorized the statements therein.  ¶¶ 118, 149.

These statements were materially misleading because, among other things, the Board and the Governance Committee have never in good faith actively sought minority candidates and, thus, were not "actively seeking" minority candidates.  *See, e.g.*, ¶¶ 120, 123, 143, 159.

In the Proxies, the Board attempted to justify its failure to nominate new diverse candidates by claiming that the individuals who have served on the Board for, in some cases, decades have valuable experience.  ¶ 121.  This was misleading because, in fact, longer-tenured directors do ***not*** serve the best interests of the company, as amply demonstrated by leading academics and professionals in the field of best corporate governance principles.  ¶ 122.  In reality, the Board's refusal to adopt director term limits and to appoint new African-American members to the Board

6

represents explicit or implicit racism at Oracle and an improper pretext for failing to add African-American individuals to the Board.  In misrepresenting the reason for failing to add new members to its Board (by falsely claiming that adding new persons to the Board would deprive Oracle of the "experience" of older white members who have served on the Board for decades), Defendants made false statements in order to get themselves reelected and to conceal the true reasons for Oracle's long-standing failure to add African-American individuals to the Board.  ¶ 123.

In the 2019 Proxy, the Board also opposed a shareholder proposal for a pay equity report, misleadingly stating:

- "[W]e are committed to ensuring that we do not discriminate on the basis of gender in our compensation programs, and we are further committed to diversity and inclusion in our workforce";
- "Diversity and inclusion in our workforce starts at the top"; and
- "Hiring and promotion pay decisions are based on a variety of non-discriminatory factors, including consideration of the job itself and the pay range associated with it, as well as the skills, experience, education and expertise the individual brings to Oracle — not race or gender."

¶¶ 125–126.  The Board similarly opposed the shareholder proposal for a pay equity report in the 2018 Proxy.  ¶ 155.  These statements were misleading because Defendants were aware of facts since at least 2017 — including from the DOL enforcement action, the *Jewett* class action, and several Congressional inquiries (¶¶ 76–88) — that women and minorities at Oracle were being paid less than white, male employees.  *See, e.g.*, ¶¶ 54, 96, 130.  Indeed, books and records produced by the Company in response to a § 220 inspection demand demonstrate that, in 2017 and 2018, the Board and its committees barely discussed and reviewed any documents before signing off on the pre-drafted opposition statements to shareholder proposals for a pay equity report. ¶¶ 127–136.  Although the Company did not produce documents for 2019, there is no reason to believe that the Board more thoroughly evaluated the pay equity report proposal in 2019.  ¶ 136.

In the 2018 and 2019 Proxies, Defendants also opposed shareholder proposals for an independent Chairman (¶¶ 138, 148), stating that the Board "do[es] not believe that a policy requiring an independent chair is necessary to ensure that the Board provides independent and effective oversight of Oracle's business and management."  ¶¶ 139, 153.  These statements were false and misleading because Defendants did not genuinely believe them.  ¶ 140.  At the time,

7

Defendants were aware that Ellison's tenure as Oracle's Chairman greatly harmed the Company, as demonstrated by prior lawsuits against the Company, Ellison's personal vendetta against HP, and his causing the Company to engage in discriminatory hiring, pay practices, and meritless litigation against his perceived enemies.  ¶ 140.  Thus, Defendants other than Ellison actually believed that an independent Chairman *would* help protect Oracle's interests but agreed to oppose the shareholder requests in the 2018 and 2019 Proxies (which were supported by 44% of shareholders in 2018) because that was what Ellison wanted and demanded.  *Id.*

The 2019 and 2020 Proxies were also materially misleading because they asked shareholders to vote in favor of executive compensation "say on pay" proposals, but failed to disclose that the executives' achievement of performance goals was based in part on unlawful discriminatory hiring and pay practices.  ¶¶ 136–137, 147.

*   *   *

The Complaint alleges that all of these omissions would have been material to a shareholder's decision as to whether to re-elect the incumbent directors.  ¶¶ 141, 144, 146–147. Notably, diversity and inclusion are valued very highly by shareholders.  *See* ¶¶ 114–115.  Here, the material omissions had their desired effect — at the Company's annual meetings in 2018 and 2019, all the incumbent directors were reelected, no term limits were imposed, the shareholder requests to publish an annual pay equity report and to have an independent Chairman were defeated, and executive compensation was approved.  ¶¶ 141, 156.

## E.     Damages to the Company

The Company has suffered significant harm and damages due to Defendants' wrongdoing and breaches of fiduciary duties, including:  (1) amounts paid to outside lawyers, accountants, and investigators in connection with internal and external investigations into issues pertaining to the lack of diversity at Oracle, discrimination lawsuits (such as the *Jewett* action), and lack of pay equity claims; (2) costs incurred from defending and paying settlements in discrimination lawsuits; (3) $3 billion judgment entered against the Company in the litigation against HP plus interest; and (5) costs incurred from unjust compensation and benefits paid to Defendants who have breached their duties to the Company.  ¶¶ 224–228, 230.  Moreover, Oracle's reputation, goodwill, and

Memorandum iso Plaintiffs' Opposition to Defendants' Motion to Dismiss

1   market capitalization have been harmed as a result of the misconduct.  ¶ 229.

2   ## IV.   LEGAL STANDARD

3   "To survive a motion to dismiss, a complaint must contain sufficient factual matter,

4   accepted as true, to state a claim to relief that is plausible on its face."  *Khoja v. Orexigen*

5   *Therapeutics*, 899 F.3d 988, 1008 (9th Cir. 2018).  In ruling on the motion, the Court must accept

6   as true all facts alleged in the complaint and draw all reasonable inferences in plaintiff's favor.  *Id.*

7   at 1012.  Notably, under Rule 8, which applies in this case, "a plaintiff need only plead sufficient

8   allegations of underlying facts to give fair notice and to enable the opposing party to defend itself

9   effectively."  *Merritt v. Countrywide Fin. Corp.*, 759 F.3d 1023, 1033 (9th Cir. 2014).

10   ## V.   ARGUMENT

11   **A.   The Complaint Adequately Pleads Demand Futility**

12   **1.   Applicable Law**

13   A plaintiff bringing a shareholder derivative action must "state with particularity" any

14   effort undertaken to obtain the desired action from the directors and "the reasons for not obtaining

15   the action or not making the effort."  FED. R. CIV. P. 23.1(b)(3).  The standards for assessing the

16   sufficiency of demand-futility allegations are governed by the law of the state of incorporation —

17   in this case, Delaware.  *See Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 108–09 (1991).

18   Notably, "the demand requirement does not exist for the benefit of defendants in derivative suits."

19   *In re AIG, Inc.*, 965 A.2d 763, 808 (Del. Ch. 2009), *aff'd sub nom Teachers' Ret. Sys. of La. v.*

20   *PricewaterhouseCoopers LLP*, 11 A.3d 228 (Del. 2011).  Rather, the law "makes it clear that

21   demand exists for the benefit of the corporation itself."  *Id.* at 808 n.160.

22   Under Delaware law, a director is disqualified from considering a demand where there is a

23   reasonable doubt that he or she is either "disinterested" or "independent."  *See Rales v. Blasband*,

24   634 A.2d 927, 935–37 (Del. 1993) (discussing *Aronson v. Lewis*, 473 A.2d 805 (Del. 1984)).  With

25   regard to disinterestedness, "demand is excused if [p]laintiffs' particularized allegations create a

26   reasonable doubt as to whether a majority of the board of directors faces a substantial likelihood

27   of personal liability for breaching the duty of loyalty."  *Rosenbloom v. Pyott*, 765 F.3d 1137, 1150

28   (9th Cir. 2014).  The duty of loyalty is violated "where directors fail to act in the face of a known

9

duty to act, thereby demonstrating a conscious disregard for their responsibilities and failing to discharge the non-exculpable fiduciary duty of loyalty in good faith." *Id.*

In *Rosenbloom*, the Ninth Circuit confirmed three settled rules for assessing demand futility.  765 F.3d at 1137.  First, the plaintiff is required only to plead particularized facts, ***not*** evidence.  *Id.* at 1156 (the district court erred by "insist[ing] on a smoking gun of [b]oard knowledge").  Second, the Court must accept all well-pleaded allegations as true, draw all reasonable inferences in plaintiff's favor, and allow plaintiff to show demand futility **based on "an *inference*" of misconduct**.  *Id.* at 1152–53, 1156.  Third, the Court must view the complaint as a whole and must ***not*** "consider[] the factual allegations in isolation."  *Id.* at 1155; *see also Del. Cnty. Emps. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1019 (Del. 2015) (the court must consider the plaintiff's allegations "***in their totality and not in isolation from each other***").

In assessing demand futility, it is not necessary that the directors be interested or lack independence ***for the same reason*** for demand to be excused.  Rather, as long as there is a majority of directors that are *either* interested *and/or* lack independence, demand is excused.  *See, e.g.*, *Rales*, 634 A.2d at 936 (after determining three of eight directors were not disinterested, court examined remaining directors for lack of independence); *In re Zillow Grp., Inc.*, 2020 U.S. Dist. LEXIS 34802, at **7 n.2, 11, 14 (W.D. Wash. Feb. 28, 2020) (finding demand futility where three out of eight directors were not independent and two additional directors were interested).

Where, as here, the Board has an even number of members, Plaintiffs need only demonstrate that half of the Board is compromised to excuse demand.  *See Beam v. Stewart*, 845 A.2d 1040, 1046 n.8 (Del. 2004).  Accordingly, for demand to be excused in this case, Plaintiffs need only demonstrate that ***seven*** out of the fourteen directors are either interested or not independent.  As discussed below, Plaintiffs easily meet that burden, thus excusing the demand.

## 2. Demand Is Futile as to Ellison

A demand is futile where the director "harbor[s] self-interest adverse to the stockholders' interests" (*Aronson*) or is "interested in the alleged wrongdoing" (*Rales*).  *UFCW & Participating Food Indus. Emp'rs Tri-State Pension Fund v. Zuckerberg*, 2020 Del. Ch. LEXIS 319, at **39–40, 43 (Del. Ch. Oct. 26, 2020); *see also In re Cornerstone Therapeutics, Inc.*, 115 A.3d 1173,

10

1179–80 (Del. 2015).   Here, the Complaint alleges that Ellison derived an improper personal benefit — to the tune of *$1 billion* in 2019 alone — by concealing and perpetuating the alleged wrongdoing.   Specifically, by allowing the Company to engage in unlawful business practices, including discriminatory hiring and compensation practices, Defendants were able to keep the Company's compensation expenses down (by paying less to female and minority employees), thus allowing for a payment of higher dividends.   ¶ 210.   For example, in 2019, Oracle paid $0.96 per share in dividends.   ¶ 212.   In light of Ellison's *35.4%* stake in Oracle (1,172,919,853 shares), that amounts to approximately *$1,126,003,059* in dividends that Ellison received in 2019 alone — a staggering benefit that was *not* shared by shareholders as a whole, given that no other shareholder holds such a large block of Oracle stock.   ¶¶ 210, 212.   Accordingly, demand is futile as to Ellison because he is self-interested and he stands to lose billions of dollars in dividends were he to authorize a lawsuit against himself or other directors.   *See, e.g.*, *UFCW*, 2020 Del. Ch. LEXIS 319, at **57–58 (finding demand to be excused as to Zuckerberg because "[a]s the controlling stockholder of Facebook, he received a material personal benefit from the [challenged transaction], and he would face a substantial risk of liability on a claim challenging it").

Moreover, the Complaint alleges that Ellison is involved in all aspects of the Company's management and, thus, faces a substantial likelihood of liability as a result of discriminatory hiring and payment practices at Oracle, which could not have happened without Ellison's knowledge. *See, e.g.*, ¶¶ 241–256; *see also Unión de Empleados de Muelles de Puerto Rico PRSSA Welfare Plan v. UBS Fin. Servs. Inc.*, 704 F.3d 155, 165–66 (1st Cir. 2013) (excusing demand where a director had "high level" involvement with the underlying misconduct); *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1080–81 & n.40 (C.D. Cal. 2008) (excusing demand as to two "inside directors" who had "*significant management responsibilities*" and, thus, were "*far closer to the alleged wrongdoing* than any of the outside directors for demand purposes").

### 3.   Demand Is Futile as to Catz and Henley

Catz has served on the Board since 2001, has served as Oracle's CEO since 2014, and has previously served as its president and CFO.   ¶ 32.   She received total compensation of $965,981 in 2019, $108,282,333 in 2018, and $40,729,965 in 2017.   ¶ 216.   Henley has served on the Board

11

since 1995, is the Vice Chairman of Oracle, and has previously served as its CFO and executive vice president.  ¶ 33.  He received total compensation of $4,214,615 in 2019.  ¶ 216.  The Company admits in the Proxies that Catz and Henley are not independent (¶¶ 259, 263), which is a "relevant" factor in evaluating demand futility.  *See Sandys v. Pincus*, 152 A.3d 124, 131–32 (Del. 2016).

Viewed in totality, these facts are sufficient to create a reasonable doubt as to whether Catz and Henley can exercise disinterested judgment in deciding whether to sue themselves or other directors for the alleged misconduct, because doing so would jeopardize their positions at Oracle and their lavish compensation.  *See, e.g.*, *Unión de Empleados*, 704 F.3d at 165–67 (excusing demand as to four inside directors, including one who was "an insider with extensive ties" to the companies and another who served at various points in time as the Chairman, President, and CEO of the companies); *In re Goldman Sachs Grp., Inc. S'holder Litig.*, 2011 Del. Ch. LEXIS 151, at *24 (Del. Ch. Oct. 12, 2011) ("It can be assumed that Blankfein and Cohn, as officials of Goldman, would be found to be interested or lack independence."); *Countrywide*, 554 F. Supp. 2d at 1080–81 & n.40 (excusing demand as to the "inside directors" who had "significant management responsibilities"); *see also In re NutriSystem, Inc. Derivative Litig.*, 666 F. Supp. 2d 501, 515 (E.D. Pa. 2009) ("Delaware courts have found that directors who are corporate employees lack independence because of their substantial interest in retaining their employment.").

Separately, demand is futile because Catz and Henley are not independent of Ellison.  The Complaint alleges that Ellison, as the Company's founder and controlling shareholder, dominates and controls the Board and has the ability to remove any director that he wishes by voting his substantial block of stock.  ¶¶ 241–256.  Specifically, Ellison richly rewards those who demonstrate their loyalty to him.  ¶¶ 243, 246–247.  At the same time, he summarily purges anyone who poses any threat to him.  ¶¶ 243, 246, 248–252.  The Complaint expressly alleges that "***Ellison has repeatedly fired or otherwise forced out high-ranking Oracle executives, including members of the Board, over personality conflicts or perceived threats to his leadership***."  ¶ 249.[2]

_____

[2] There can be no dispute that Ellison is a controlling shareholder, even though he does not own more than 50% of the shares.  "From a practical perspective, the confluence of voting control with directorial and official decision making authority is itself quite consistent with control of the board."  *In re Trump Hotels S'holder Derivative Litig.*, 2000 U.S. Dist. LEXIS 13550, at *22

Memorandum iso Plaintiffs' Opposition to Defendants' Motion to Dismiss

Analyzing these same facts in another derivative action on behalf of Oracle, Vice Chancellor Glasscock easily found that demand would be excused against Catz and Henley (and Hurd, who is no longer on the Board) because they lack independence from Ellison:

> Catz, Hurd, and Henley are all senior Oracle officers who lack independence from Ellison.  Even if he does not qualify as a controller (a question I need not decide here), Ellison owns a 28% stake in Oracle, the company he cofounded over forty years ago.  Moreover, Ellison allegedly maintains a firm grip on Oracle's day-to-day operations, and he has shown a willingness to remove directors and officers who cross him.  Thus, the Plaintiff has created reasonable doubt that Catz, Hurd, or Henley could bring their business judgment to bear in deciding whether to sue Ellison.

*Oracle*, 2018 Del. Ch. LEXIS 92, at *48.  The same is true here.

### 4.     Demand Is Futile as to Conrades, James, and Seligman

Defendants do not seriously challenge that demand is also futile as to Conrades, James, and Seligman because they are not independent of Ellison.  *See* MTD at 28 n.25.  Nor can they, given the Complaint's extensive allegations regarding longstanding and intertwined relations between these directors and Ellison (¶¶ 264–275), which another court already found sufficient to excuse demand as to these defendants.  *See Oracle*, 2018 Del. Ch. LEXIS 92, at **49–58.

As the court in *Oracle* observed, "[a] plaintiff may establish that a director lacks independence by alleging with particularity that the director is sufficiently loyal to, beholden to, or otherwise influenced by an interested party to undermine the director's ability to judge the matter on its merits."  *Id.* at *49; *see also Sandys*, 152 A.3d at 128.  Although allegations of mere personal friendship or a mere outside business relationship, standing alone, are insufficient to raise a reasonable doubt about a director's independence, "some professional or personal friendships, which may border on or even exceed familial loyalty and closeness, may raise a reasonable doubt

---

(S.D.N.Y. Sept. 21, 2000).  As a result, "Delaware courts have found substantial minority interests, ranging from 20% to 40% sufficient to grant the holder working control."  *Id.*  Here, the Complaint sufficiently alleges that Ellison yields significant and controlling power over Oracle.

For example, former Board member Joe Costello was driven off Oracle's Board after his company, Cadence Design Systems, selected an Oracle competitor for a particular contract.  ¶ 248.  Similarly, Oracle's President, Chief Operating Officer, and director Ray Lane was forced to resign in June 2000 — three weeks before approximately $70 million in options were about to vest (and which were thus forfeited) — after conflicting with Ellison over the leadership of Oracle.  ¶ 250.  Likewise, Oracle's Executive Vice President Gary Bloom, once thought of as a possible successor to Ellison, left Oracle after falling out of Ellison's favor.  ¶ 251.  Terence Garnett is another Oracle executive who was pushed out of Oracle after he refused to steer business opportunities and Oracle's corporate resources to Ncube Corp., a company owned by Ellison.  ¶ 252.

13

1    whether a director can appropriately consider demand." *Oracle*, 2018 Del. Ch. LEXIS 92, at *49.

2    In analyzing whether a director lacks independence, Delaware law "requires that all the

3    pled facts regarding a director's relationship to the interested party be considered in full context,"

4    with "all inferences from those particularized facts [drawn] in favor of the plaintiff, *not* the

5    defendant." *Sandys*, 152 A.3d at 128; *see also Oracle*, 2018 Del. Ch. LEXIS 92, at *49 ("In

6    conducting the independence inquiry, I must consider all the particularized facts pled by the

7    plaintiff about the relationships between the director and the interested party in their totality and

8    not in isolation from each other."). Here, the Complaint's allegations, viewed in totality with all

9    reasonable inferences drawn in Plaintiffs' favor, demonstrate that demand would be futile as to

10   Defendants Conrades, James, and Seligman because they lack independence from Ellison.

11           **a.**     **Conrades**

12   The Complaint alleges that Conrades has held multiple high-level positions at Akamai

13   Technologies Inc., and that Oracle and Akamai have made substantial purchases from each other.

14   ¶ 273. While Conrades was Executive Chairman of Akamai, Akamai received over a million

15   dollars from transactions between it and Oracle. *Id.* Conrades is also a major investor in and

16   director of MyTaskIt, a software startup. ¶ 274. MyTaskIt's CTO is Michael Russo, a Senior

17   Director of Development at Oracle. *Id.* Russo needs Oracle management's approval to continue

18   working at MyTaskIt. *Id.* Further, Conrades is Partner Emeritus at Polaris Venture Partners and

19   Managing Partner at Longfellow Venture Partners — venture capital firms focused on areas in

20   which Oracle is an active acquirer. ¶ 275. To that end, Polaris and Longfellow have portfolio

21   companies that rely on Oracle technology or are managed by former Oracle executives. *Id.*

22   The Complaint further alleges that Conrades derives substantial benefit from his continued

23   membership on the Board. Since 2008, he has received ***over $4.8 million*** in cash and stock awards

24   and expects to receive ***half a million per year*** in subsequent years — a material amount to any

25   individual. ¶ 272. Conrades's membership on the Board, however, is in jeopardy. In recent years,

26   a majority of Oracle's non-Ellison stockholders have withheld votes for Conrades (and other

27   Compensation Committee members) in order to express their disapproval of these directors' failure

28   to address stockholder concerns about executive compensation. *See* ¶ 138. For example, at the

Memorandum iso Plaintiffs' Opposition to Defendants' Motion to Dismiss

2018 annual meeting, there were 1,828,120,062 votes "for" Conrades and 1,171,891,742 votes were withheld.  ¶ 156.  Without Ellison's support (who owns 1,172,919,852 shares (¶ 210)), Conrades would not have been reelected.[3]  ***Thus, the only reason Conrades has not been forced to resign is Ellison's continuing support.***  As Vice Chancellor Glasscock found, in light of the allegations that Ellison has displayed a willingness to remove directors who crossed him in the past (*see* ¶¶ 243, 246, 248–252), "it is reasonable to infer that Conrades would lose his board seat at the next annual stockholder meeting if Ellison decided to withhold support."  *Oracle*, 2018 Del. Ch. LEXIS 92, at **51–52.  As a result, the combined effect of Conrades's business ties and the threat of losing his directorship are more than sufficient to create reasonable doubt that he could impartially consider whether to sue Ellison, making demand futile.  *See id.*

### b.  Seligman

Seligman and her husband founded a private-sector think tank called the Research Board, and Ellison frequently attended and presented at Research Board events.  ¶ 268.  Seligman and her husband also founded Ostriker von Simson, a technology consulting firm that heads the CIO Strategy Exchange.  *Id.*  Ellison has attended and presented at CIO Strategy Exchange events.  *Id.*  Were Seligman to authorize a lawsuit against Ellison, Ellison would stop attending CIO Strategy Exchange events, thereby threatening Seligman and her husband's life work.

Moreover, Seligman and her husband have known Ellison since the late 1980s and, according to a book published by Seligman's husband, have had "numerous interactions over the subsequent years."  ¶ 269.  Seligman and her husband also own two condominiums on Lanai, a Hawaiian island in which Ellison owns a 98% stake.  ¶ 270.  Ellison owns almost all of Lanai's businesses and infrastructure, including many of the commercial buildings, homes, and apartments, the Four Seasons hotels and golf courses, the water company and utilities, half the roads, one of the two grocery stores, the community center and pool, the movie theater, and some 88,000 acres of land.  *Id.*  With Seligman and her husband's ownership of the two condos comes the eligibility to become a member of the Island Club that provides access to all Four Seasons' facilities and golf courses for half price membership.  *Id.*  Seligman and her husband are also one

---

[3] $1,828,120,062 - 1,172,919,852 = 655,200,210.  655,200,210 < 1,171,891,742.$

Memorandum iso Plaintiffs' Opposition to Defendants' Motion to Dismiss

of four couples making up the "Champion" donors category (the highest donor circle for individual donors) to the TriLanai, which offers races on Lanai and is sponsored in part by Ellison-owned Pulama Lanai (which, in turn, runs the operations of the Lanai island).  ¶ 271.

These allegations, viewed in totality, cast reasonable doubt on Seligman's independence from Ellison.  Just like the joint ownership of a jet in *Sandys*, which the Delaware Supreme Court found sufficient to demonstrate lack of independence, an ownership of two condos on an island owned by the Company's controlling shareholder "is not a common thing" and "is suggestive of the type of very close personal relationship that, like family ties, one would expect to heavily influence a human's ability to exercise impartial judgment."  *See* 152 A.3d at 130.

Seligman also derives substantial benefit from her continued membership on the Board.  Since 2006, she has received **over $5.3 million** in cash and stock awards and expects to receive **half a million per year** in subsequent years — a material amount to any individual.  ¶ 267.  What's more, just like Conrades, her membership on the Board is in jeopardy.  In recent years, a majority of Oracle's non-Ellison stockholders have withheld votes for Seligman (and other Compensation Committee members) in order to express their disapproval of these directors' failure to address stockholder concerns about executive compensation.  *See* ¶ 138.  For example, at the 2018 annual meeting, there were 1,857,247,097 votes "for" Seligman and 1,142,764,707 votes were withheld.  ¶ 156.  Without Ellison's support (who owns 1,172,919,852 shares (¶ 210)), Seligman would not have been reelected.[4]  ***Thus, the only reason Seligman has not been forced to resign is Ellison's continuing support***, which is more than sufficient to demonstrate that she is beholden to — and, thus, lacks independence from — Ellison.  *See also Oracle*, 2018 Del. Ch. LEXIS 92, at **55–58 (finding similar allegations to be sufficient to excuse demand as to Seligman).

### c.      James

James is an Operating Executive at the Carlyle Group.  ¶ 265.  In that capacity, she serves on the boards of Veritas Holdings Ltd. and ION Investment Group Limited, two Carlyle portfolio companies.  *Id.*  Veritas specializes in information management, and Oracle is an important Veritas partner.  *Id.*  In a 2017 interview, Veritas's CTO discussed "the very long future that the two

---

[4] 1,857,247,097 – 1,172,919,852 = 684,327,245.  684,327,245 < 1,142,764,707.

Memorandum iso Plaintiffs' Opposition to Defendants' Motion to Dismiss

companies have together on working on the problem of information management." *Id.*  ION, a software conglomerate, has a business segment that is "a Gold level member of the Oracle Partner Network." *Id.*  In October 2017, Oracle's Board determined that James was no longer independent under the New York Stock Exchange's listing standards because she was appointed CEO of a joint venture between Oracle, Carlyle, and MACOM Technology Solutions Holdings, Inc. ¶ 266.  Catz publicly described James as a close friend at Oracle's 2014 OpenWorld Conference. ¶ 265.

Until 2016, James served as Intel's President.  ¶ 266.  Since then, she has publicly stated that she is trying to become the CEO of another large technology company.  *Id.*

In addition, James derives substantial benefit from her continued membership on the Board.  Since 2016, she has received ***over $1.6 million*** in cash and stock awards and expects to receive ***half a million per year*** in subsequent years — a material amount to any individual.  ¶ 264. In a talk at Stanford, James described her approach to dealing with boards of directors:  "When you're CEO, it's all about the board.  If you have a dysfunctional board and a board that isn't supportive or that has [its] own internal dynamic and politics, life's too short for that."  *Id.*

Reviewing the same allegations, another court found demand excused as to James:

> Considered collectively, these allegations lead me to doubt that James could exercise independent business judgment in evaluating a demand to sue Ellison or Catz.  James sits on the boards of two companies that have significant business relationships with Oracle.  I agree with the Defendants that, standing alone, such ties do not create a disabling conflict.  But there is more.  James has made clear her desire to head a major technology company.  Given Oracle's prominence in the technology arena, it is reasonable to infer that James's career ambitions would weigh heavily on her if she were asked to consider suing Ellison, who continues to wield outsized influence at the company.  James's remarks about the importance of a board that is "supportive" of a CEO cast further doubt on her independence.  True, James also disapproved of blindly following a CEO's wishes, but the Plaintiff is entitled to a pleading-stage inference that James might be too deferential to either Ellison or Catz to bring her independent business judgment to bear in evaluating a demand.  That is especially so in light of Catz's public statement that she is close friends with James.

*Oracle*, 2018 Del. Ch. LEXIS 92, at **53–54.  This Court should do the same and find that James lacks independence from Ellison and Catz and, thus, that demand is excused.

**5.      Demand Is Futile as to at Least One of the Remaining Outside Directors**

As discussed above, Plaintiffs have demonstrated that Ellison, Catz, Henley, Conrades, Seligman, and James are either interested or lack independence.  Accordingly, Plaintiffs need only demonstrate that one additional director lacks independence or is interested to excuse demand on

17

1    the Board.  As discussed below, Plaintiffs easily meet that burden.

2                    a.    **Panetta**

3            Panetta is not independent of Ellison due to his lucrative compensation as a director and

4    his close ties to Ellison and his family.  Among other things, Panetta has ties to Ellison's daughter,

5    Megan Ellison — who is a film producer and financier, which prevents Panetta from acting

6    independently of Ellison.  ¶ 296.  Specifically, Panetta (who at that time was the Director of the

7    CIA) played an important role in the development of Megan Ellison's funded film, "Zero Dark

8    Thirty," which chronicles the hunt for and ultimate Navy SEAL raid leading to the death of Osama

9    bin Laden.  *Id.*  According to declassified CIA documents, Panetta personally offered to help the

10   producer of "Zero Dark Thirty" with unprecedented access to CIA information and remained in

11   close contact throughout the filmmaking process.  ¶¶ 296–297.  Megan Ellison (through her

12   company Annapurna Productions) covered the entire approximately $45 million budget for "Zero

13   Dark Thirty." ¶ 297.  She was also heavily involved in its pre- and post-production.  *Id.*  While

14   several U.S. senators openly criticized the movie, Panetta came to its defense.  *Id.*  This

15   unprecedented collaboration, *viewed together with Panetta's subsequent nomination to his current*

16   *lucrative position on Oracle's Board in 2015*, are sufficient to create reasonable doubt that Panetta

17   can authorize a lawsuit against Ellison.  *See Sandys*, 152 A.3d at 130.

18           This is particularly true in light of the fact that Panetta depends on Ellison to retain his

19   membership on the Board.  Since joining the Board in 2015, Panetta has received ***over $2 million***

20   in cash and stock awards and expects to receive ***half a million per year*** in subsequent years — a

21   material amount to any individual.  ¶ 295.  Panetta's membership on the Board, however, is in

22   jeopardy.  As discussed above, in recent years, a majority of Oracle's non-Ellison stockholders

23   have withheld votes for Panetta (and other Compensation Committee members) in order to express

24   their disapproval of these directors' failure to address stockholder concerns about executive

25   compensation.  *See* ¶ 138.  For example, at the 2018 annual meeting, there were 2,063,787,934

26   votes "for" Panetta and 936,223,870 votes were withheld.  ¶ 156.  Without Ellison's support (who

27   owns 1,172,919,852 shares (¶ 210)), Panetta would not have been reelected.[5]  ***Thus, the only***

28

_____

[5] 2,063,787,934 − 1,172,919,852 = 890,868,082.  890,868,082 < 936,223,870.

Memorandum iso Plaintiffs' Opposition to Defendants' Motion to Dismiss

1    *reason Panetta has not been forced to resign is Ellison's continuing support.*

2          As Vice Chancellor Glasscock found with regard to two other Compensation Committee

3    members (Conrades and Seligman), in light of the allegations that Ellison has displayed a

4    willingness to remove directors who crossed him in the past (*see* ¶¶ 243, 246, 248–252), "it is

5    reasonable to infer that [Panetta] would lose his board seat at the next annual stockholder meeting

6    if Ellison decided to withhold support." *See Oracle*, 2018 Del. Ch. LEXIS 92, at **51–52. As a

7    result, the combined effect of Panetta's business ties with Ellison's family and the threat of losing

8    his directorship are more than sufficient to create reasonable doubt that he could impartially

9    consider whether to sue Ellison, making demand futile. *See id.*

10                    **b.      Berg**

11          Berg is not independent of Ellison due to his long-standing position as a director of Oracle,

12   having served on the Board *since 1997*, and his prior material connection to Ellison and his family

13   throughout his professional career.    ¶ 276.    Specifically, Berg has been an agent in the

14   entertainment industry for more than 35 years, serving as the chairman and CEO of International

15   Creative Management, Inc. ("ICM"), a talent agency for the entertainment industry, between 1985

16   and 2012. ¶ 278. Among other things, ICM represented David Ellison, Larry Ellison's son, in his

17   initial interest in an acting career in the movie "Flyboys." ¶ 279. ICM, through Berg, also worked

18   with David Ellison to secure part of the financing for "Flyboys." *Id.* ICM also acted as the U.S.

19   sales agent for "Flyboys," and Berg himself organized the party for "Flyboys," which was held on

20   Larry's Ellison's yacht at the time, the Rising Sun. *Id.*

21          Berg also derives substantial benefit from his continued membership on the Board. Since

22   2009, he has received **over $6.3 million** in cash and stock awards and expects to receive **half a**

23   **million per year** in subsequent years — a material amount to any individual. ¶ 277. The Complaint

24   alleges that this amount is particularly material to Berg, who was ousted from ICM in 2012 after

25   a bitter power struggle with ICM founding partner Chris Silbermann. ¶ 280. After his ouster from

26   ICM, Berg started his own entertainment agency Resolution in 2013, which shuttered within 18

27   months. *Id.* Berg now runs a small agency Northside Services, LLC, which is currently estimated

28   to have 4 employees and annual revenues of $211,032, making his Oracle compensation material

19

based on publicly available compensation information for his other business ventures.  *Id.*

Viewed in totality, Berg's longstanding and close personal and business relationships with Ellison raise reasonable doubt as to his ability to authorize a lawsuit against Ellison.  This is particularly true in light of the fact that, given his ouster from ICM and the fact that he earns significantly more as a director on Oracle's Board than does his agency (Northside Services), Berg stands to lose material compensation if he authorizes a lawsuit against Ellison.  Accordingly, Berg lacks independence from Ellison, excusing the demand.  *See Sandys*, 152 A.3d at 130.

### c.   Boskin

Boskin is the Tully M. Friedman Professor of Economics and Hoover Institution Senior Fellow at Stanford University, where he has been on the faculty since 1971.  ¶ 282.  Boskin is not independent of Ellison due to his long-standing position as a director of Oracle (having served on the Board *since 1994*), his lucrative compensation as a director (having received *over $9.4 million* in cash and stock awards since 2009, with the expectation of receiving half a million per year in subsequent years), and Ellison's ties to Stanford University.  ¶¶ 281–282.

Stanford University has close ties to Ellison and Oracle, including:  (1) The Lawrence Ellison Foundation has made nearly $3 million in donations to Stanford in the past 3 years; (2) Oracle has made donations to Stanford each year for at least the past 10 consecutive years, and in fiscal year 2016 alone has donated between $19 and $30 million to Stanford; (3) Oracle is Stanford University's Strategic Partner; and (4) Oracle is a founding member of the Stanford Medicine Corporate Partners program, which supports the development of the new Stanford Hospital, pursuant to which Oracle has granted Stanford $25 million over 10 years.  ¶ 283.

These close ties prevent Boskin from independently evaluating matters concerning Ellison. Among other things, were Boskin to authorize a lawsuit against Ellison, that would reasonably likely lead to Ellison stopping his substantial donations to Stanford, which may jeopardize Boskin's continued employment there.  *See Sandys*, 152 A.3d at 130.  Moreover, Boskin is also a personal friend of Ellison.  ¶ 286.  Boskin made a $500,000 donation to the UC Davis Health System, the hospital that repaired Ellison's shattered elbow after a 1992 high-speed bicycle crash and where Ellison established the Lawrence J. Ellison Ambulatory Care Center.  *Id.*  When Boskin

Memorandum iso Plaintiffs' Opposition to Defendants' Motion to Dismiss

was injured in a 1999 car accident, a media report described Ellison as a "constant visitor," bringing sushi to Boskin's hospital room.  *Id.*  While potentially insufficient by themselves, these allegations, together with Ellison's deep ties to Stanford (Boskin's employer) are sufficient to give rise to a reasonable doubt that Boskin can act independently of Ellison, thus excusing demand.

### d.    Chizen

Finally, Chizen is not independent of Ellison due to his lucrative compensation as a director and his ties to Stanford University.  ¶ 287.   Since 2009, Chizen has received **over $7.1 million** in cash and stock awards due to his membership on the Board and expects to receive **half a million per year** in subsequent years — a material amount to any individual.  ¶ 288.  Chizen also has ties to Stanford, which further demonstrate his lack of independence.  Chizen was featured as a speaker in a Stanford course offered on Cloud computing, which was taught by former Oracle On Demand president Timothy Chou (whose bio lists him as having been a leader in bringing enterprises to the cloud since 1999, when he returned to Oracle to work for Ellison).  *Id.*  The Chizen Family Foundation, of which Chizen is President and a Director, has donated to Stanford Hospital in at least 2013 and 2014.  *Id.*  For the same reasons as set forth above, these allegations, viewed in totality, demonstrate that Chizen lacks independence from Ellison, thus excusing the demand.

### 6.    Demand Is Futile Because All of the Directors (Except Sikka) Face a Substantial Likelihood of Liability for Disseminating Misleading Statements in the 2018 and/or 2019 Proxies

If the Court agrees and finds that Ellison, Catz, Henley, Conrades, Seligman, James, and at least one additional director (Panetta, Berg, Boskin, or Chizen) are interested or lack independence for the reasons set forth above in Parts V.A.2–5, the analysis can end there because that would yield **7 out of 14 directors** who are compromised, thus excusing the demand.  In the alternative, as discussed below, all the directors (except Sikka) are also interested because they face a substantial likelihood of liability for disseminating misleading statements in the Proxies.

### a.    Breach of Fiduciary Duty Claim

Under Delaware law, "a board of directors is under a fiduciary duty to disclose material information when seeking shareholder action."  *Malone v. Brincat*, 722 A.2d 5, 9 (Del. 1998).  This is true with regard to proxy statements.  *See Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d

21

1270, 1277 (Del. 1994) (a fiduciary disclosure obligation "attaches to proxy statements and any other disclosures in contemplation of shareholder action").  Thus, when directors submit to the stockholders a matter that requires stockholder approval, the directors must disclose all facts that are material to the stockholders' consideration of the matter and that are or can reasonably be obtained through their position as directors.  *See Stroud v. Grace*, 606 A.2d 75, 84 (Del. 1992) ("[D]irectors of Delaware corporations [have] a fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks shareholder action.").  Directors who knowingly disseminate false and misleading statements to shareholders "may be considered to be interested for purposes of demand." *In re infoUSA, Inc. S'holders Litig.*, 953 A.2d 963, 990–91 (Del. Ch. 2007).  Such misconduct constitutes fiduciary breaches that "implicate loyalty or bad faith" and thus cannot be exculpated under charter provisions permitted by Delaware law.  *See In re Ebix, Inc. Stockholder Litig.*, 2014 Del. Ch. LEXIS 132, at *84 (Del. Ch. July 24, 2014).

Here, all of the current directors (except Sikka) approved the 2019 Proxy and all of the current directors (except Fairhead and Sikka) approved the 2018 Proxy.  ¶¶ 118, 149.  As discussed above (*see supra* Part IV.D), the Proxies omitted material facts, including that:

- Contrary to the statements in the Proxies, the Board and the Governance Committee do *not* "value diversity of backgrounds" and are *not* "committed to actively seeking" minority candidates for nomination to the Board.  ¶¶ 118–119, 151.  Instead, the Board and the Governance Committee have never in good faith actively sought minority candidates.  *See, e.g.*, ¶¶ 120, 123, 143, 159.

- Contrary to the statements in the Proxies (¶¶ 121, 152), lengthy tenures by directors (some of whom have served *several decades* on the Board) were *not* in the best interests of the Company and its shareholders but, instead, led to the existence of a very entrenched Board and failure to consider new, diverse candidates for nomination to the Board.  *See, e.g.*, ¶¶ 122–123, 143, 159.

- The statements in opposition to shareholders' proposals that the Company publish an annual pay equity report were false and misleading because the Company was *not* "committed to ensuring that [it does] not discriminate on the basis of gender in [its] compensation programs" and was *not* "committed to diversity and inclusion in [its] workforce," "[h]iring and promotion pay decisions" were *not* "based on a variety of non-discriminatory factors," but instead were based on race and gender; and the Board did *not* genuinely believe that "[d]iversity and inclusion in [the Company's] workforce start[ed] at the top."  *See* ¶¶ 125–126, 155.  These statements were misleading because Defendants were aware since at least 2017 — including from the DOL enforcement action, the *Jewett* class action, and several Congressional inquiries (¶¶ 76–88) — that women and minorities at Oracle were being paid less than white, male employees.  *See, e.g.*, ¶¶ 54, 96, 130.

- The statements in opposition to shareholders' proposals for an independent Chairman (¶¶ 139, 153) were misleading because the Board did *not* genuinely

22

believe that an independent Chairman was not necessary. ¶ 140. In fact, Defendants were aware that retention of Ellison as Oracle's Chairman was resulting in great harm to the Company and, thus, actually believed that an independent Chairman *would* help protect Oracle's interests, but agreed to oppose the shareholder requests in the Proxies because that was what Ellison wanted and demanded. *Id.*

- As to the "say on pay" proposals, the Proxies were misleading because they failed to disclose that the executives' achievement of performance goals was based in part on unlawful discriminatory hiring and pay practices. ¶¶ 136–137, 147.

- Contrary to the statements in the Proxies, the Company lacked effective internal controls, particularly with regard to diversity (including on the Board), anti-discrimination, anti-harassment, pay equity, and other relevant areas of critical importance to the Company. *See, e.g.*, ¶¶ 145, 180.

The Complaint also includes detailed allegations that the omitted facts were known to Defendants. *See, e.g.*, ¶¶ 13, 54, 96, 130, 140, 162–164. Such knowledge includes, among other things, (1) an enforcement action commenced by the DOL in 2017 (¶¶ 80, 84–86, 88); (2) a class action commenced in 2017, alleging that Oracle has for years paid women less than men for substantially similar work (¶¶ 17, 81–82); and (3) at least two Congressional inquiries, which slammed Oracle's lack of diversity and lack of efforts to diversify its leadership (¶¶ 76–78).

Numerous courts have found similar allegations of defendants' breaches of their duty of disclosure (*i.e.*, duty of loyalty) to be sufficient to give rise to a reasonable likelihood of liability. *See, e.g.*, *infoUSA*, 953 A.2d at 990 ("the willingness of certain directors to issue Form 10-Ks that, allegedly, materially misrepresented the nature of benefits provided to [the CEO]" was "egregious enough that the directors involved [were] likely to face personal liability"); *In re Synchronoss Techs.*, 2019 U.S. Dist. LEXIS 229476, at **60–64 (D.N.J. Nov. 26, 2019) (plaintiff has alleged particularized facts suggesting a substantial risk of liability by directors for breach of the duty of loyalty stemming from the company's failure to disclose material information).

### b. Violation of Section 14(a)

The same allegations also give rise to a substantial likelihood of liability for violation of § 14(a). For example, in *Shaev v. Baker*, Judge Tigar found that defendants faced a substantial likelihood of liability based on plaintiffs' allegations that the challenged proxy statements omitted several material facts, including disclosures regarding "***ineffective internal and disclosure controls***" and "Board-approved compensation programs that incentivized fraudulent account openings for years." *See* 2017 U.S. Dist. LEXIS 68523, at *53 (N.D. Cal. May 4, 2017). Similarly,

23

here, the Complaint alleges that the 2018 and 2019 Proxies omitted numerous material facts, *including with regard to Oracle's ineffective internal controls*, which caused the Company to cover up the unlawful pay equity gap at the Company and discrimination against women and minorities with respect to hiring and promotion.  ¶¶ 65–66, 68, 143(d), (g), (k), 145, 180.  To that end, the Complaint specifically alleges that "the Company's corporate governance structure and defective internal controls allowed senior executives and the Board to sidestep real accountability and instead *continue perpetuating the discriminatory practices that led to the DOL lawsuit and the Company's discriminatory pay practices, private class action lawsuits filed by female employees, Congressional inquiry into the lack of diversity at Oracle, and other discrimination in hiring practices and lack of diversity on both the Board and management*."  ¶ 145.

As a result of these material omissions, the shareholders voted to reelect the directors and to approve executive compensation — an "essential link."  ¶¶ 141, 144, 147.  This is similar to *Shaev*, where the plaintiffs alleged that *absent the false and misleading statements in the proxy statements*, "shareholders would not have voted to re-elect Board members, approve executive compensation … , and reject an independent Board chairman."  *See* 2017 U.S. Dist. LEXIS 68523, at **54–55; *see also In re Zoran Corp. Derivative Litig.*, 511 F. Supp. 2d 986, 1016 (N.D. Cal. 2007); *Countrywide*, 554 F. Supp. 2d at 1077 ("shareholders would be interested in knowing whether the directors would use deceptive methods to achieve the performance measures that were the benchmarks of the 2005 and 2006 compensation plans").

The Complaint also adequately pleads Defendants' knowledge.  Under Delaware law, directors have an obligation to respond to potential corporate actions *on an informed basis* and *after due deliberation*.  *See Aronson*, 473 A.2d at 812 ("[D]irectors have a duty to inform themselves, prior to making a business decision, of all material information reasonably available to them.  Having become so informed, they must then act with requisite care in the discharge of their duties.").  Thus, it is reasonable to infer that directors who approved the 2018 and 2019 Proxies did so on an informed basis and after due deliberation, including with the knowledge of the DOL lawsuit, the *Jewett* class action, and two Congressional inquiries (¶¶ 76–88).  *See Shaev*, 2017 U.S. Dist. LEXIS 68523, at **55–56 (rejecting defendants' argument "that the complaint

24

1  does not allege sufficient Board involvement in the preparation of the disclosures" and finding

2  sufficient plaintiffs' allegation that all of the relevant directors were on the Board at the time and

3  that they "caused" the company to file the challenged proxy statements); *In re Reliance Sec. Litig.*,

4  135 F. Supp. 2d 480, 503–04 (D. Del. 2001) (directors "ought to be held responsible for the

5  statements in the documents" that they sign, even if they did not participate in drafting them).

6  **c.**   **Defendants' Arguments to the Contrary Lack Merit**

7  Defendants contend that they do not face a substantial likelihood of liability because

8  Plaintiffs' § 14(a) claim does not seek any monetary damages.  MTD at 12–13.  They purport to

9  rely on *MCG Capital Corp. v. Maginn*, 2010 Del. Ch. LEXIS 87 (Del. Ch. May 5, 2010), and *In

10 re Am. Apparel, Inc.*, 2015 U.S. Dist. LEXIS 191466 (C.D. Cal. Apr. 28, 2015).  Both of those

11 cases are inapposite, however, because they dealt with ***lack of damages*** as a result of exculpatory

12 provisions adopted under 8 DEL. CODE § 102.  *See MCG Capital*, 2010 Del. Ch. LEXIS 87, at

13 **79–80; *Am. Apparel*, 2015 U.S. Dist. LEXIS 191466, at *45.  Here, on the other hand, Plaintiffs

14 allege that Defendants have breached their duties of loyalty and good faith — both of which ***cannot***

15 be exculpated under Delaware law.  *See, e.g.*, *In re Reliance Sec. Litig.*, 91 F. Supp. 2d 706, 732

16 (D. Del. 2000) (plaintiffs "have averred sufficient circumstantial evidence to permit the inference

17 that one or more defendants may have ***knowingly withheld material information*** from the

18 Company's shareholders," giving rise to a violation of the directors' duty of loyalty).

19 Because § 102 does not apply, Defendants face a substantial likelihood of liability for

20 breaching their fiduciary duties, aiding and abetting breaches of fiduciary duties, abuse of control

21 (as to Ellison and Catz), and unjust enrichment that could expose them to significant monetary

22 damages.  Even with regard to the § 14(a) claim, the injunctive relief requested in the Complaint

23 includes, among other things:  (1) a proposal that at least three directors resign; (2) a proposal that

24 Ellison step down as the Chairman; and (3) a proposal that 30% of executives' compensation be

25 tied to the achievement of diversity goals.  *See* Prayer for Relief, Part B.  If implemented, the

26 requested injunctive relief will likely deprive Ellison, Catz, Henley, as well as certain of the outside

27 directors of:  (1) any compensation for those directors that step down from the Board; and (2) part

28 of the compensation for the executives where diversity goals are not met.  The requested injunctive

25

Memorandum iso Plaintiffs' Opposition to Defendants' Motion to Dismiss

1    relief will also likely increase compensation paid to minority and women employees, thereby

2    decreasing the lavish dividends received by Defendants.  *See* ¶¶ 212–214.  This is more than

3    sufficient to give rise to a substantial likelihood of liability to excuse demand.[6]

4          Defendants next argue that Plaintiffs have failed to plead "a contradiction between the

5    alleged materially misleading statements and reality."  MTD at 13.  This argument is puzzling

6    because, as discussed above, the Complaint pleads in great detail that there was a stark

7    contradiction between (1) the statements in the Proxies regarding the fact that the Company was

8    supposedly "actively seeking" minority candidates for the Board (¶¶ 118–119, 151) and the

9    reasons for its opposition to term limits, an independent Chairman, and annual pay equity reports

10   (¶¶ 121, 125–126, 139, 152–153); and (2) the true facts, *i.e.*, that the Board has never in good faith

11   actively sought minority candidates (¶ 120) and that the Board was aware that the true reason for

12   the Company's opposition to term limits and an independent Chairman was that the Company's

13   conduct "represents explicit or implicit racism at Oracle and an improper pretext for failing to add

14   Black and minority individuals to the Board" (¶ 121).[7]  The Board also knew such conduct was

15   damaging the Company (¶¶ 123, 140), and that the Company was accused of paying less to women

16   and minorities in the DOL lawsuit, the *Jewett* class action, and two Congressional inquiries (¶¶ 76–

17   88, 128, 130).  Contrary to Defendants' arguments, even though these allegations are taken from

18   unadjudicated lawsuits, they are more than sufficient (particularly as to allegations by former

19   employees) at the pleading stage to plausibly allege that the statements and the reality were

20   contradictory.  *See, e.g.*, *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 792 (9th Cir. 2020) (the

21   district court improperly failed to credit, at the pleading stage, allegations in the whistleblower's

22   complaint, particularly where they were "based on firsthand knowledge" that the whistleblower

23   "could reasonably be expected to possess" by virtue of his employment at the company).

24         Next, relying on *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-*

25

26         [6] In contrast, in *MCG Capital*, the requested injunctive relief was merely for an order "to provide full and timely information" to the board and "to timely and accurately record the deliberations and actions of the Board and its Committees," which was not "the type of personal liability necessary to excuse demand."  *See* 2010 Del. Ch. LEXIS 87, at **79–80.

28         [7] "[I]n reality Oracle has not actively sought to recruit minorities and has just attempted to create the false impression that it is "committed" to doing so."  ¶ 118.

26

Memorandum iso Plaintiffs' Opposition to Defendants' Motion to Dismiss

*Packard Co.*, 845 F.3d 1268 (9th Cir. 2017), Defendants argue that "statements of corporate commitments" are not actionable.  MTD at 15.  But in finding that plaintiffs failed to allege objective falsity in *Retail Wholesale*, the Ninth Circuit specifically emphasized that the challenged statements were made *in the company's ethics code* and specifically distinguished the Sixth Circuit's decision in *Omnicare*,[8] which involved false and misleading statements *in SEC filings*.  *See* 845 F.3d at 1276.  Here, the challenged statements occur in legally mandated proxy statements filed with the SEC and concern information the SEC determined is *per se* material.[9]  *See, e.g.*, ¶¶ 118–119, 121, 125–126, 138, 151–154.  Accordingly, such statements are actionable.[10]

Indeed, the Proxies were misleading because they omitted the fact that the Board does not actively seek minority candidates.  ¶ 120.  It is also alleged that the Board agreed to oppose shareholder requests for annual pay equity reports *without any actual deliberation or consideration of the issues*.  *See* ¶¶ 127–136.  The U.S. Supreme Court has held that such omissions can be actionable, particularly where (as here) the statement implies that some investigation has been made, *when in fact none has been made*:

> [A] reasonable investor may, depending on the circumstances, understand an opinion statement to convey facts about how the speaker has formed the opinion—or, otherwise put, about the speaker's basis for holding that view.  And if the real facts are otherwise, but not provided, the opinion statement will mislead its audience. Consider an unadorned statement of opinion about legal compliance: "We believe our conduct is lawful."  If the issuer makes that statement without having consulted a lawyer, it could be misleadingly incomplete.

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 188 (2015). Moreover, the statements in the Proxies urging shareholders to vote against a proposal for an independent Chairman were misleading because Defendants knew Ellison was not independent and had engaged in a reckless personal vendetta against HP, Inc. that resulted in a $3 billion

---

[8] *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455 (6th Cir. 2014).

[9] Notably, information regarding diversity is required to be disclosed by Item 407 of SEC Regulation S-K.  ¶¶ 114–116. The disclosure requirement is based on the SEC's determination that "it is useful for investors to understand how the board considers and addresses diversity, as well as the board's assessment of the implementation of its diversity policy, if any."  *Id*.

[10] Moreover, in *Retail Wholesale* and *In re Am. Apparel, Inc. S'holder Litig.*, 855 F. Supp. 2d 1043 (C.D. Cal. 2012), plaintiffs' claims were subject to heightened pleading standard under Rule 9(b) and PSLRA, neither of which is applicable to Plaintiffs' § 14(a) claim here, which is grounded in negligence.  *Cf. Varjabedian v. Emulex Corp.*, 888 F.3d 399, 408 (9th Cir. 2018); *see also Travelers Commercial Ins. Co. v. Hansen*, 2016 WL 1745818, at *3 (N.D. Cal. May 3, 2016).

27

1  judgment against Oracle, which remains unpaid and is accruing interest at 10%.  ¶¶ 140, 143(f),

2  171-198.  As observed in *Omnicare*, such statements are also actionable.  *See* 575 U.S. at 184.

3          For example, in *Constr. Laborers Pension Trust v. CBS Corp.*, the court found a statement

4  by CBS's then-CEO regarding the #MeToo movement to be materially misleading, despite its

5  arguably aspirational nature.  433 F. Supp. 3d 515, 539 (S.D.N.Y. 2020).  The court found the

6  statement to be misleading because it could be reasonably interpreted as "representing that [the

7  CEO] was just learning of problems with workplace sexual harassment at CBS," whereas, in fact,

8  "he was at that time actively seeking to conceal his own past sexual misconduct from CBS and the

9  public."  *Id.* at 539–40; *see also id.* at 533 (observing that a statement would be actionable if the

10 misconduct proscribed by the code was so "pervasive" as to plausibly demonstrate that the

11 company "in fact, held none of its asserted aspirations").  The same is true here, as Defendants

12 were aware of the pervasive discrimination in pay and hiring based on gender and race at Oracle

13 but nonetheless authorized concrete, specific statements in the Proxies which represented that the

14 Company was "***actively seeking women and minority candidates for the pool from which director***

15 ***candidates are selected***" (¶ 117; *see also* ¶¶ 118–119, 125, 151) as well as affirmatively false

16 statements that "[h]iring and promotion pay decisions are based on a variety of non-discriminatory

17 factors … — not race or gender" (¶ 126).[11] These false statements were made at a time when

18 Oracle was facing intense scrutiny of its lack of diversity and discriminatory pay practices,

19 including Congressional inquiries, "putting a spotlight on the company's hiring and management

20 practices."  ¶ 9; *see also* ¶¶ 10, 54, 135, 216.  Under such circumstances, the false statements are

21 actionable.  *See In re Signet Jewelers Ltd. Sec. Litig.*, 2018 U.S. Dist. LEXIS 199809, at **17, 22

22 (S.D.N.Y. Nov. 26, 2018) (statements regarding Signet's anti-sexual harassment policies and

23 procedures were actionable where the complaint plausibly alleged a "culture of pervasive sexual

24 harassment," which was "rampant at Signet at all levels, including among senior executives," and

25

26          [11] *See also In re Wells Fargo & Co. S'holder Derivative Litig.*, 282 F. Supp. 3d 1074,
    1102–04 (N.D. Cal. 2017) (actionable § 14(a) claim where "the thrust of Plaintiffs' complaint is
27  that Defendants knew of, but failed to disclose, a fraudulent business practice that put the company
    at material risk"); *Countrywide*, 554 F. Supp. 2d at 1076–77 (actionable § 14(a) claim where
28  plaintiffs alleged "that the proxy statements failed to disclose that Countrywide abandoned its
    underwriting standards, thus exposing itself to an undisclosed level  of heightened risk").

Memorandum iso Plaintiffs' Opposition to Defendants' Motion to Dismiss

which was the subject of a pending arbitration proceeding); *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 622–23, 659–60 (S.D.N.Y. 2017) (holding that the company's statements "about the Code of Ethical Conduct or about the Company's anti-corruption policies and efforts," including its repeated statement that it had adopted an "effective process for preventing and combatting corruption and bribery," could be the basis of a securities fraud claim where the statements were made "in an effort to reassure the investing public about the Company's integrity" in the midst of ongoing, "high-profile" bribery investigations).

**B.      The Complaint Adequately Alleges the Causes of Action**

If the Court finds demand futility to be adequately pleaded, the Court should also find that Plaintiffs have adequately stated a claim.   *See In re Atmel Corp. Derivative Litig.*, 2008 WL 2561957, at *9 (N.D. Cal. June 25, 2008) ("courts have held that where a plaintiff has alleged facts sufficient to prove demand futility[,] they have also satisfied the burden under Rule 12(b)(6)").

**1.      The Complaint States a Claim for Breach of Fiduciary Duty (*Count I*)**

To state a claim for breach of fiduciary duty, a plaintiff must plead (i) the existence of a fiduciary relationship, and (ii) its breach.  *Beard Research, Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch. 2010); *Teachers Ret. Sys. v. Aidinoff*, 900 A.2d 654, 671 n.23 (Del. Ch. 2006).  Delaware officers and directors owe the duties of care, good faith, and loyalty to their corporations and the stockholders they serve.  *Malone*, 722 A.2d at 10; *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156 (Del. 1995).  "This duty has been consistently defined as 'broad and encompassing,' demanding of a director 'the most scrupulous observance.'"  *Belcom, Inc. v. Robb*, 1998 WL 229527, at *3 (Del. Ch. Apr. 28, 1998).  The Complaint sets forth in detail the various fiduciary duties that each Defendant owed to Oracle, including the duties of good faith and loyalty.  *See* ¶¶ 58–59.  Defendants do not dispute the fiduciary relationship between themselves and Oracle and its shareholders.  Rather, they contend the Complaint does not satisfy Rule 8's notice pleading requirements for breach.  MTD at 29–33.  Defendants' arguments fall flat.

**a.      Defendants Breached Their Fiduciary Duties by Disseminating Materially Misleading Proxy Statements**

"Fiduciary duty requires honesty from corporate directors in their communications with the public and shareholders about corporate matters."  *Pirelli Armstrong Tire Corp., etc. v. Stumpf*,

29

2012 WL 424557, at *6 (N.D. Cal. Feb. 9, 2012).  Thus, "[c]ommunications that depart from this expectation, particularly where it can be shown that the directors involved issued their communication with the knowledge that it was deceptive or incomplete, violate the fiduciary duties that protect shareholders."  *infoUSA.*, 953 A.2d at 990; *see also Malone*, 722 A.2d at 14.

As discussed above (*see supra* Part V.A.6.a), Defendants breached their fiduciary duty of loyalty by knowingly disseminating materially misleading proxy statements in 2018 and 2019. *See infoUSA.*, 953 A.2d at 990; *see also Wells Fargo*, 282 F. Supp. 3d at 1095 (finding "sufficient" plaintiffs' allegation that "the Director Defendants are liable because they signed SEC filings with material and misleading information") (citing *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1061 (9th Cir. 2000)).  Plaintiffs, thus, have adequately pleaded a claim for breach of fiduciary duty.

### b. Defendants Breached Their Fiduciary Duty by Their Conscious Disregard of "Red Flags" of Unlawful and Discriminatory Practices

"Where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith."  *Stone ex rel. AmSouth Bancorp. v. Ritter*, 911 A.2d 362, 370 (Del. 2006).  A plaintiff may show conscious disregard by pointing to "red flags" and a subsequent failure to act in the face of such information.  *See South v. Baker*, 62 A.3d 1, 15 (Del. Ch. 2012); *Rich ex rel. Fuqi Int'l, Inc. v. Yu Kwai Chong*, 66 A.3d 963, 984 (Del. Ch. 2013).

The Complaint alleges that Defendants "breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to cover up Oracle's discrimination, and caused Oracle to incur substantial damage."  *See* ¶¶ 60–61.  The Complaint further alleges that these breaches constitute "a knowing and culpable violation" by Defendants "of their obligations as officers and directors of Oracle, the absence of good faith on their part, and a reckless disregard for their duties to the Company."  *Id.*

Defendants characterize these allegations as a "*Caremark*" failure-to-monitor claim. MTD at 30 (citing *In re Caremark Int'l Inc. Derivative Litig.,* 698 A.2d 959 (Del. Ch. 1996)).  But Plaintiffs' allegations that the Board ignored unlawful and discriminatory practices can be assessed "either as a *Caremark*-type oversight claim or as an *Aronson*-type allegation of considered board

Memorandum iso Plaintiffs' Opposition to Defendants' Motion to Dismiss

action." *Rosenbloom*, 765 F.3d at 1150–51.  Courts considering similar allegations have held that the *Aronson* test applies to allegations the board of directors made a considered decision not to act. *See, e.g., In re TASER Int'l S'holder Derivative Litig.*, 2006 WL 687033, at *17 (D. Ariz. Mar. 17, 2006); *see also In re Abbott Labs. Derivative S'holders Litig.*, 325 F.3d 795, 806–09 (7th Cir. 2003) (distinguishing between complaint's allegations "that the directors 'knowingly' in an 'intentional breach and/or reckless disregard' of their fiduciary duties 'chose' not to address the FDA problems in a timely manner" and allegations of an "unconsidered failure to take action by the directors"); *In re Pfizer Inc. S'holder Derivative Litig.*, 722 F. Supp. 2d 453, 460 (S.D.N.Y. 2010) (applying the *Aronson* test to allegations that the defendant directors "knew of a high probability that Pfizer was continuing to purposely promote off-label marketing and deliberately decided to let it continue by blinding themselves to that knowledge").

Regardless of which standard applies, because Defendants "had actual or constructive knowledge of violations of the law at [Oracle]" concerning its unlawful and discriminatory practices "and did nothing," the Board "violated its duty of loyalty."  *See Rosenbloom*, 765 F.3d at 1151.  Plaintiffs' allegations, in other words, afford "an *inference* of conscious inaction" — all that is required at this stage.  *See id.* at 1156 (emphasis in original).

### i.      The Complaint Alleges "Red Flags"

The Complaint alleges that under Defendants' watch, there were pervasive legal violations going on at Oracle, including unlawful pay equity gap and discrimination against women and minorities with respect to hiring and promotion.  *See, e.g.*, ¶¶ 8–10, 74–100, 162–180.  The Complaint also describes in detail numerous "red flags" that were waved at Defendants, alerting them to these unlawful practices, including:  (1) two $400 million dollar lawsuits Oracle was fighting (¶¶ 17, 80–89); and (2) two separate letters sent by Congress in 2019, stating that the lack of diversity on its Board was inexcusable and demanding that it remedy the problem (¶¶ 9, 77).

Courts have held that a board's failure to act when presented with these types of red flags supports a finding of liability for breach of fiduciary duty.  *See, e.g.*, *Rosenbloom*, 765 F.3d at 1153 (FDA warning letters relating to the subject matter of the lawsuit were red flags, and the board's inaction in the face of these red flags supports a finding of liability); *Pfizer*, 722 F. Supp. 2d at

31

462–63 (reckless disregard of red flags, including several reports to board members of continued misconduct suggesting non-compliance with the law, supported breach of fiduciary duty claim); *Abbott Labs.*, 325 F. 3d at 806 (numerous FDA warning letters and other alerts that the company was disobeying FDA regulations were red flags that the directors disregarded and supported a finding of liability for breach of fiduciary duty).

Defendants argue the Complaint fails to plead that they consciously failed to monitor Oracle's operations, asserting that "[l]awsuits (like the DOL Lawsuit and the *Jewett* Action) and government inquiries (like the Congressional letter) do not constitute 'red flags' that a company engaged in misconduct." MTD at 32. Defendants' cited cases, however, are inapt because they all involved situations where the red flags never made their way to the board level. *See Marvin H. Maurras Revocable Trust v. Bonfman*, 2013 WL 53483578, at *8 (N.D. Ill. Sept. 24, 2013) ("it is not reasonable to infer that whenever a company has violated a law and the CEO is aware of the violation, the CEO will inform the board"); *In re Johnson & Johnson Derivative Litig.*, 865 F. Supp. 2d 545, 572 (D.N.J. 2011) ("Without allegations that [the CEO] shared his knowledge with the Board, the Court cannot conclude that the Board was ever aware of the FDA letters.").

Defendants' reliance on *Melbourne Mun. Firefighters Pension Trust Fund v. Jacobs*, 2016 WL 4076369 (Del. Ch. Aug. 1, 2016), is also misplaced. MTD at 32. There, the plaintiffs alleged that the board's response to potential red flags of violations of antitrust laws, consisting primarily of public relations and lobbying industry participants and government officials, was "insufficient." *See Melbourne*, 2006 WL 4076369, at *12. Here, in contrast, Plaintiffs' allegations concern the Board's failure to take *any* action in response to the Company's pervasive and ongoing discriminatory practices; not that its response to those practices was insufficient.

Lastly, Defendants note that "neither the DOL Lawsuit nor the *Jewett* Action involved allegations about the *Board* discriminating against minority candidates." MTD at 32–33. But Defendants neglect to mention that lack of Board diversity was the subject of two Congressional letters. ¶¶ 9, 77. Further, Defendants' failure to ensure Board diversity is but one of the ongoing and pervasive discriminatory practices alleged in the Complaint, which at this stage must be read as a whole and all reasonable inference must be drawn in Plaintiffs' favor. *See AIG.*, 965 A.2d at

777 (allowing breach of fiduciary duty claim to be maintained against senior corporate officers where complaint alleged that "[e]ach officer … was directly responsible for the business units whose conduct was critical to the pervasive misconduct alleged" and "[t]hat misconduct was not isolated; it permeated [the corporation's] way of doing business"); *Countrywide*, 554 F. Supp. 2d at 1082 (denying motion to dismiss where complaint alleged a failure to take corrective action despite "widespread deviations from the underwriting policies and the standards being committed by employees at all levels").

### ii.   The Complaint Alleges Harm to the Company

Defendant also contends "the Complaint does not plead any cognizable harm or 'corporate trauma' to Oracle." MTD at 31. Not so. The Complaint alleges that the Defendants' breaches have caused significant and particular harm. This includes but is not limited to the following: vast sums of money spent on attorneys' and consultant fees as a result of the *Jewett* and DOL suits; a loss of the Company's goodwill and market capitalization from the Congressional inquiries, *Jewett* and DOL lawsuits, and press reports regarding the Company's discriminatory practices and lack of independence from Ellison; and the $3 billion verdict against the Company as a result of the HP litigation. *See* ¶¶ 223–230.

### 2.   The Complaint States a Claim for Aiding and Abetting (*Count II*)

"To state a claim for aiding and abetting a breach of fiduciary duty, a plaintiff must allege (1) a fiduciary relationship, (2) a breach of that relationship, (3) that the alleged aider and abettor knowingly participated in the fiduciary's breach of duty, and (4) damages proximately caused by the breach." *Gatz v. Ponsoldt,* 925 A.2d 1265, 1275 (Del. 2007).

Defendants contend that Plaintiffs' aiding and abetting claim fails because they cannot establish a predicate breach of fiduciary duty claim. MTD at 34. However, as demonstrated above, Plaintiffs have adequately plead a breach of fiduciary duty claim against each Defendant.

Defendants also contend that Plaintiffs have failed to sufficiently allege "knowing participation" by any director Defendant. MTD at 34. But knowing participation need not be plead with particularity. *In re Shoe-Town, Inc. Stockholders Litig.*, 1990 WL 13475, at *8 (Del. Ch. Feb. 12, 1990). Rather, a plaintiff must only plead "factual allegations … from which knowing

participation can be reasonably inferred."  *Id.*  Plaintiffs have met this burden by alleging that, as members of the Board, Defendants knowingly participated in the other Board members' breaches of fiduciary duty.  *See*, *e.g.*, ¶¶ 63–69, 306.

### 3.   The Complaint States a Claim for Abuse of Control (*Count III*)

Plaintiffs' abuse of control claim alleges that Defendants Ellison and Catz "owed duties as controlling persons to Oracle not to use their positions of control for their own personal interests and contrary to Oracle's interests" and that their failure to do so "constitutes an abuse of their ability to control and influence the Company."  ¶¶ 309–311.   Although Defendants contend that Delaware law recognizes no independent tort of "abuse of control" (*see* MTD at 34), courts have declined to dismiss similar claims under Delaware law.  *See*, *e.g.*, *Belova v. Sharp*, 2008 WL 700961, at *9 (D. Or. Mar. 13, 2008).  This Court should do the same.

### 4.   The Complaint States a Claim for Unjust Enrichment (*Count IV*)

Delaware has long recognized a claim for unjust enrichment.  *See, e.g.*, *Schock v. Nash*, 732 A.2d 217, 232-233 (Del. 1999).   Under Delaware law, unjust enrichment is the "unjust retention of benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience."  *Ryan v. Gifford*, 918 A.2d 341, 361 (Del. Ch. 2007).

Defendants' only challenge to Plaintiffs' unjust enrichment claim is that "Plaintiffs plead no facts showing that any of the Director Defendants' shareholder-approved compensation related to any unlawful conduct."   MTD at 34.   But contrary to Defendants' characterization, the Complaint includes numerous allegations demonstrating that Defendants reaped financial rewards — including their compensation and very positions on the Board — at Oracle's expense while knowingly or recklessly allowing the Company's discriminatory and unlawful practices to continue.   *See*, *e.g.*, ¶¶ 159–161.   Plaintiffs thus sufficiently allege that Defendants received compensation from Oracle without justification and contrary to "the fundamental principles of justice or equity and good conscience." *Ryan*, 918 A.2d at 361.

### 5.   The Complaint States a Claim for Violation of Section 14(a) (*Count V*)

To succeed under a claim for violation of § 14(a) of the Exchange Act and SEC Rule 14a-

34

9, a plaintiff must demonstrate that (1) a proxy statement's "misstatement or omission was made with the requisite level of culpability" and (2) the proxy statement was an "essential link in the accomplishment of the proposed transaction."  *Wells Fargo*, 282 F. Supp. 3d at 1101.

As discussed above (*see supra* Part V.A.6.b), Plaintiffs have adequately pleaded a claim for violation of § 14(a) and SEC Rule 14a-9.  This claim therefore withstands dismissal too.

## C.   The Court Should Refuse to Enforce Oracle's Forum-Selection Clause

Defendants ask that in the event the Court dismisses the § 14(a) claim, it should then dismiss the remaining claims for *forum non conveniens*.  In so arguing, Defendants concede — as they must — that the forum-selection clause ***cannot*** be applied to Plaintiffs' § 14(a) claim.

The forum-selection clause (which chooses Delaware Court of Chancery as the venue) does not apply to a claim for violation of § 14(a) of the Exchange Act because federal courts have ***exclusive*** jurisdiction over such claims.  *See* 15 U.S.C. § 78aa(a); *see also Cottrell v. Duke*, 737 F.3d 1238, 1245 (8th Cir. 2013) (observing that "Delaware courts have no jurisdiction" to address the plaintiffs' Exchange Act claims); *Butorin v. Blount*, 106 F. Supp. 3d 833, 837 (S.D. Tex. 2015) (observing that Delaware Court of Chancery lacks jurisdiction over plaintiff's § 14(a) claim and, on that basis, denying motion to dismiss for *forum non conveniens*).  And this Court has a "virtually unflagging" "obligation" to hear and decide cases within its jurisdiction.  *See, e.g.*, *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014).

Accordingly, if the Court upholds the § 14(a) claim, it should refuse to dismiss the other claims on the basis of *forum non conveniens*.  The alternative — where some claims are required to be brought in Delaware Court of Chancery, while other claims remain in this Court — would lead to needless duplication and waste of judicial and parties' resources.   Under similar circumstances, other courts have declined to sever claims and denied motions to dismiss on the basis of a forum-selection clause.  *See, e.g.*, *Butorin*, 106 F. Supp. 3d at 837.

## VI.   CONCLUSION

The Court should deny Defendants' motion to dismiss in its entirety.  If the Court is inclined to grant the motion in any part, Plaintiffs respectfully request leave to amend.  *See Khoja*, 899 F.3d at 1011; *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 712 (9th Cir. 2001).

DATED:  March 1, 2021

Respectfully submitted,

**BOTTINI & BOTTINI, INC.**
Francis A. Bottini, Jr. (SBN 175783)
 *fbottini@bottinilaw.com*
Albert Y. Chang (SBN 296065)
 *achang@bottinilaw.com*
Anne Beste (SBN 326881)
 *abeste@bottinilaw.com*
Yury A. Kolesnikov (SBN 271173)
 *ykolesnikov@bottinilaw.com*

  s/ *Francis A. Bottini, Jr.*
  Francis A. Bottini, Jr.

7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone:   (858) 914-2001
Facsimile:    (858) 914-2002

**RENNE PUBLIC LAW GROUP**
Louise H. Renne (SBN 36508)
 *lrenne@publiclawgroup.com*
Ruth Bond (SBN 214582)
 *rbond@publiclawgroup.com*
Steve Cikes (SBN 235413)
 *scikes@publiclawgroup.com*
Imran Dar (SBN 296182)
 *idar@publiclawgroup.com*
350 Sansome Street, Suite 300
San Francisco, California  94101
Telephone:   (415) 848-7200
Facsimile:    (415) 848-7230

*Co-Lead Counsel for Plaintiffs*

**JOHNSON FISTEL, LLP**
Frank J. Johnson (SBN 174882)
 *FrankJ@johnsonfistel.com*
Brett M. Middleton (SBN 199427)
 *BrettM@johnsonfistel.com*
John J. O'Brien (SBN 253392)
 *JohnO@johnsonfistel.com*
655 West Broadway, Suite 1400
San Diego, California  92101
Telephone:  (619) 230-0063
Facsimile:    (619) 255-1856

*Attorneys for Plaintiff Alison Sherman*

36